## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY JUSTICE and 5TH WHEEL RECORDS, INC. and MY HEARTLAND PUBLISHING, LLC, *each individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br><br>v.<br><br><br>SUNO, INC.,<br><br>Defendant | Case No. 1:25-cv-11739-FDS<br><br><br><br>**FIRST AMENDED COMPLAINT**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Anthony Justice ("Plaintiff Justice"), 5th Wheel Records, Inc. ("5th Wheel Records"), and My Heartland Publishing, LLC ("My Heartland") (collectively, "Plaintiffs"), each individually and on behalf of all others similarly situated, by and through undersigned counsel, file this First Amended Complaint against Suno, Inc. ("Suno") and allege as follows:

### INTRODUCTION

1.      Suno, Inc. is a Massachusetts company that markets an artificial intelligence program for generating music. Rather than creating songs independently, Suno's system copies vast amounts of existing music from online platforms and uses it to produce new tracks that mimic the sound, style, and even the voices of real artists, competing directly with music creators and their copyrighted works.

2.      On June 24, 2024, the world's largest record labels, UMG Recordings, Inc., Sony Music Entertainment and Warner Music International Services Limited, amongst others (the "major record labels"), filed a lawsuit against Suno (Case No. 1:24-cv-11611-FDS (the "Lawsuit"), alleging copyright infringement for willfully using their copyrighted sound recordings

1

to train Suno's artificial intelligence ("AI") music generator.

3.    While this high-profile Lawsuit continues to draw attention for its implications on major record label music, it is independent artists - whose exclusive rights in their sound recordings and their underlying compositions (hereafter their "music" or "songs") have been trampled most severely.

4.    Independent artists remain sidelined, unrepresented, and deprived of a meaningful remedy.

5.    While Suno has openly and unapologetically admitted to scraping and duplicating "tens of millions" of "publicly available" songs[1], these songs are by majority owned and controlled by Plaintiffs, Class Members, and Subclass Members (as defined herein).

6.    Suno's actions were not only unlawful, but an unconscionable attack on the music community's most vulnerable and valuable creators.

7.    Plaintiffs, Class Members, and Subclass Members will never be able to claw back their songs unlawfully copied by Suno and used to train its AI.

8.    Once AI ingests songs for training, those songs are stored in the AI's neural network, and not capable of deletion or retraction.

9.    These acts by Suno were abuse and exploitation of the worst kind of songs owned by Plaintiffs, Class Members, and Subclass Members.

10.    Rather than license these songs, like other AI Companies already have done, Suno elected to steal Plaintiffs', Class Members', and Subclass Members' songs.

11.    Suno obtained these songs by unlawfully "stream ripping" them from the streaming platform YouTube.

12.    Suno circumvented the YouTube technological measures designed specifically to

---

[1] Lawsuit, Doc. 28, ¶ 41

prevent such unauthorized copying.

13.    Suno AI model(s) has generated AI-soundalike music based on the songs of Plaintiffs, Class Members, and Subclass Members (hereafter the "infringing works").

14.    Suno's AI model created infringing works at virtually no cost to Suno.

15.    Suno, as part of its answer in the Lawsuit, argues that despite clear copyright infringement of independent artist's music, the doctrine of fair use, a defense to copyright infringement pursuant to 17 U.S.C. § 107, shields Suno from liability.

16.    This categorical "*per se* fair use" defense by Suno fails to account for, and conveniently ignores, the end purpose analysis for AI training.

17.    Meaning, Suno focuses on the curation and ingestion process as the driving factors behind the alleged transformative process triggering fair use.

18.    However, and according to the Supreme Court, the *end purpose* is one of the most important aspects of the analysis[2].

19.    As it relates to fair use and AI specifically, the most relevant and influential agency in the United States concerning all things copyright - the U.S. Copyright Office - recently undertook to research and analyze the issue of whether the training of AI models on copyrighted works qualifies as fair use.

20.    The U.S. Copyright Office released its pre-publication report, Copyright and Artificial Intelligence, Part 3: Generative AI Training (the "Report") in May of 2025.

21.    As discussed more herein, the Copyright Office emphasized that the fair use doctrine does not excuse unauthorized training on expressive works (e.g., music) particularly when

---

[2] *See Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 533 (2023) ("The same copying may be fair when used for one purpose but not another"); *see also Google LLC v. Oracle America, Inc.,* 141 S. Ct. 1183, 1197-98 (2021) (holding that Google's copying of portions of Oracle's Java API code constituted fair use because the code was used in a transformative way to create a new platform – Android - for smartphones, thereby serving a different purpose than the original).

those works are used to generate substitutional outputs that may replace the originals in the relevant marketplace.[3]

22.     The Supreme Court in *Andy Warhol Foundation* tightened the "purpose and character" analysis of fair use, where a secondary work serves substantially the same purpose and targets the same audience as the original; confirming that a commercial secondary use serving the same function and audience weighs strongly against fair use. Adding that stylistic changes do not excuse appropriation when the result competes in the same market.[4]

23.     As the Recording Industry Association of America aptly summarized, "there's nothing fair about stealing an artist's life's work, extracting its core value, and repackaging it to compete directly with the originals, as the Supreme Court just held in its landmark Warhol Foundation case."[5]

24.     Suno's business model which takes songs freely available on the Internet and repackages them into competing AI-generated songs epitomizes the very conduct that *Warhol* and other courts make clear is not fair use.[6]

25.     Suno training its AI model on the songs of Plaintiffs, Class Members and Subclass Members without authorization, to then create competing music in the exact same marketplace, does not qualify for fair use and therefore constitutes copyright infringement.

26.     Other courts are echoing the principle that bad-faith conduct cannot be laundered

---

[3] Report at pp. 107-108.
[4] *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 532–33 (2023).
[5] Murray Stassen, Suno [has] admitted training its AI on copyrighted music[.], *Music Business Worldwide* (Oct. 22, 2024), available at https://www.musicbusinessworldwide.com/suno-with-a-500m-valuation-has-admitted-training-its-ai-on-copyrighted-music-it-just-named-timbaland-as-a-strategic-advisor1/ (quoting a RIAA spokesperson), last accessed September 1, 2025
[6] *See also Authors Guild, Inc. v. Google, Inc.,* 804 F.3d 202, 208–10 (2d Cir. 2015), where *Google Books* involved copying to serve the limited purpose of enabling searching. The court found that purpose to be distinct from the purpose of the copied works. *Id*. at 217-18. In other words, the purpose of copying the books was not to then create competing books in the exact same marketplace. Accordingly, the court determined that Google's copying could not serve as a substitute for the copied works, finding that Google's search function did not "provid[e] the public with a substantial substitute for matter protected by the [p]laintiffs' copyright interests in the original works or derivatives of them." *Id*. at 207.

into fair use simply because the end use is claimed to be transformative.

27.    Not only did the *Authors Guild v. Google* court stress that fair use requires lawful acquisition of works before transformative application[7], but similarly in *Bartz v. Anthropic PBC*, the court rejected the notion that pirated inputs could ever qualify for fair use, noting it "doubts that any accused infringer could ever meet its burden of explaining why downloading source copies from pirate sites that it could have purchased or otherwise accessed lawfully was itself reasonably necessary to any subsequent fair use. There is no decision holding or requiring that pirating a book that could have been bought at a bookstore was reasonably necessary".[8]

28.    As increasingly recognized, the wholesale ingestion of creative works (such as Plaintiffs', Class Members', and Subclass Members' songs) to train an AI model is unlawful without express permission.

29.    In *Kadrey v. Meta Platforms, Inc.*, the court explained, "companies have been unable to resist the temptation to feed copyright-protected materials into their models without getting permission from the copyright holders or paying them for the right to use their works for this purpose. This case presents the question whether such conduct is illegal." Here, the court found that in most cases "the answer will likely be yes."[9]

30.    The court went on to emphasize that "it is generally illegal to copy protected works without permission" and that the fair use doctrine "typically doesn't apply to copying that will significantly diminish the ability of copyright holders to make money from their works (thus significantly diminishing the incentive to create in the future)."[10]

31.    Not only does a robust and long-used licensing system exist today for businesses

---

[7] *Authors Guild v. Google, Inc.* at 220-21.
[8] *Bartz v. Anthropic PBC*, No. 24-cv-05417, 2025 WL 1741691, at *18-19 (N.D. Cal. June 23, 2025) (Order on Fair Use).
[9] *Kadrey v. Meta Platforms, Inc.*, No. 23-cv-03417-VC, slip op. at 1 (N.D. Cal. June 25, 2025).
[10] *Id.*

like Suno to utilize, but Plaintiffs, Class Members, and Subclass Members heavily rely on licensing, streaming, and synchronization opportunities to monetize their music.

32.    As just one example, and for last year alone, Spotify reported paying ten (10) billion dollars ($10,000,000,000) in music royalties to artists and rightsholders, a large portion of said royalties belonging to independent artists, according to Spotify.[11]

33.    Suno's unauthorized uses undermine the existing streams of revenue for Plaintiffs, Class Members and Subclass Members, including licensing markets, which the Copyright Office itself recognized as valid and protectable.[12]

34.    Feasible, voluntary, opt-in licensing models for AI training already exists, demonstrating there is no necessity to engage in wholesale, unlicensed scraping.

35.    Content licensing is a new potential market for licensing uses of composition and sound recording rights, and companies such as ElevenLabs (an AI music generator business similar to Suno) are premiering a forthcoming "Pro" model trained on music licensed from Merlin and Kobalt representing artists and writers who expressly opt in.[13]

36.    This type of ethical, opt-in licensing demonstrates that AI companies can build powerful models while fully respecting copyright law and compensating creators, directly undercutting any argument that wholesale, unauthorized scraping of music is necessary for innovation.

37.    Plaintiffs, Class Members, and Subclass Members own the two (2) sides of their songs, both the compositions and the sound recordings.

38.    Suno not only scraped them, copied them, stored them, and used them without

---

[11] Lour & Clear, Spotify Annual Music Economic Report (March 2025), accessible at https://loudandclear.byspotify.com/, last accessed September 2, 2025.
[12] See Report at 107.
[13] ElevenLabs Launches AI Music Model, Signs Licenses with merlin & Kobalt: Here's How It Will Work, Billboard Pro (August 5, 2025), available at https://www.billboard.com/pro/elevenlabs-ai-music-model-merlin-kobalt-licenses-details/, last accessed September 2, 2025

permission, but upon information and belief, infringing works produced by Suno are substantially similar, if not exactly identical, to the songs of Plaintiffs', Class Members, and Subclass Members.

39.     Suno has yet to disclose these "publicly available" platforms, but upon information and belief, Suno acquired many of the songs it ingested into its AI training model(s) by downloading them directly from streaming platforms such as YouTube and Spotify.

40.     To obtain these works, Suno engaged in "stream ripping," a form of piracy that circumvents encryption, authentication, and other digital rights management (DRM) technologies, thereby bypassing technological protection measures designed to prevent unauthorized copying.

41.     These acts not only violated the terms of service of those platforms but also directly enabled Suno to build its training dataset from copyrighted works without authorization.

42.     Multiple independent sources have also documented separate instances in which Suno reproduced "soundalike" outputs (hereafter the "samples"), as discussed further herein.

43.     A *sample* is defined by Merriam-Webster Dictionary as an excerpt from a recording (such as a popular song by another performer) that is used in a musical composition, recording, or performance.[14]

44.     Meaning, a "sample" or "sampling" is to incorporate a part of a pre-existing song into a new song.

45.     Although Suno publicly claims that its system does not sample or replicate any particular songs, the evidence tells a different story.

46.     Independent sources have repeatedly identified instances where Suno's outputs are not merely in the style of existing works but actually contain verbatim or near-verbatim excerpts of pre-existing songs, including outputs that imitate the voices of the artists performing on those songs.

---

[14] "Sample", Merriam Webster, available at https://www.merriam-webster.com/dictionary/sample, last accessed September 2, 2025.

47.     These outputs include reproductions of melodies, lyrics, instrumentals, and even full passages indistinguishable from the originals.

48.     The existence of these outputs undermines Suno's representations about that nature of its AI model output processes.[15]

49.     However, as just one example, Suno's AI model has been documented reproducing and outputting "producer tags" which are integral parts of the songs of Plaintiffs, Class Members, and Subclass Members.

50.     These producer tags are understood in the music industry to often be samples appearing in songs and function as a signature and/or source identifier (akin to a signature on a painting or street art) for Plaintiffs, Class Members, and Subclass Members.

51.     Beyond their function of as brand identifiers for Plaintiffs, Class Members, and Subclass Members, they are often musical in nature and part of the final work(s).

52.     The use of Plaintiffs, Class Members, and Subclass Members producer tags and other replicated elements in Suno's outputs constitutes copyright infringement of the reproduction right and, with respect to the underlying musical compositions, infringement of the exclusive right to prepare derivative works under 17 U.S.C. § 106(2).

53.     Even if Suno denies "sampling" and instead characterizes the outputs as "re-creations" or "soundalikes" of these producer tags, such works are nonetheless unauthorized derivative works of the compositions and reproduce protectable expression from the songs.

54.     By reproducing these copyrighted identifiers - whether exactly or in substantially similar form - Suno created outputs that are likely to cause confusion regarding authorship, collaboration, sponsorship, or endorsement, thereby engaging in unfair competition.

55.     In the alternative, the revenue obtained through this exploitation of Plaintiffs', Class

---

[15] *See* Defs.' Mot. To Dismiss, Doc. 22, p.2 "No Suno output contains anything like a 'sample' from a recording in the training set…"

Members', and Subclass Members' material and artistic signatures constitutes unjust enrichment, as Suno profited from the misappropriation of Plaintiffs', Class Members', and Subclass Members' exclusive rights and goodwill without compensation.

56.     Plaintiff Justice is an independent country music artist, selling over 100,000 albums and earning over 21,000,000 YouTube views.

57.     Plaintiff Justice has additionally amassed a substantial following on social media platforms as he has invested substantial time and money into bringing awareness around his music.

58.     Plaintiff Justice has received millions of streams on his songs on music platforms such as Spotify, such as his hit song "Last of the Cowboys" which has already received over eight million (8,000,000) streams.

59.     Plaintiff Justice has incredibly built a sustainable career even while serving as a full-time truckdriver in the United States.

60.     Plaintiff Justice's independently created songs have not only resonated with millions of listeners but are valuable intellectual property belonging exclusively to Plaintiff Justice and his respective businesses.

61.     5th Wheel Records is a recording company owned and operated by Plaintiff Justice. To better protect his intellectual property, many of Plaintiff Justice's songs are registered under his music business entity, 5th Wheel Records, including those in Exhibit A hereto.

62.     My Heartland is a publishing company owned and operated by Plaintiff Justice. To better protect his intellectual property, many of Plaintiff Justice's songs are registered under his music business entity, My Heartland, including those in Exhibit A hereto.

63.     Plaintiffs and Class Members are independent recording artists and entities owned or controlled by such independent recording artists who hold U.S. copyright registrations for songs licensed on music streaming services.

64.     Plaintiffs, Class Members, and Subclass Members not only monetize their songs but also look for voluntary free-market licensing opportunities as part of their music business operations.

65.     Plaintiffs, Class Members, and Subclass Members hold International Standard Recording Codes ("ISRCs") uniquely identifying their songs.

66.     Subclass Members, whether due to financial hardship, physical or technological limitations that prevent them from completing the registration process, or other barriers such as lack of access to a computer or reliable internet, have not obtained formal U.S. copyright registrations.

67.     Subclass Members are not asserting federal copyright infringement claims but nonetheless own and control valuable songs that they actively distribute and exploit in the relevant marketplace, including through voluntary licensing opportunities as part of their music business operations.

68.     Defendant Suno is a generative AI service that creates digital music based on user prompts, typically within seconds.

69.     Suno charges many of its users monthly fees to use its website platform Suno.com, which includes accessibility from a mobile application (collectively hereafter the "Suno Website"), which produces digital music files, which are designed to mimic human-made songs (hereafter "AI Music").

70.     Suno already has over 12,000,000 users generating AI music using the Suno Website, with outputs that have cumulated millions of streams.

71.     While Suno was initially evasive when asked what its AI model(s) trained on, Suno, as part of the Lawsuit, admitted to copying songs on a massive scale, in the tens of millions of songs.

72.    Suno callously admits to training its AI model(s) on "publicly available" music,[16] which Plaintiffs, Class Members, and Subclass Members allege encompasses a large volume, if not by far majority, the music of Plaintiff, Class Members, and Subclass Members.

73.    These "publicly available" platforms include YouTube available at https://www.youtube.com.

74.    Upon information and belief, these publicly available platforms include Spotify available at https://www.Spotify.com.

75.    Upon information and belief, these publicly available platforms include Jamendo available at https://www.jamendo.com/.

76.    Upon information and belief, these publicly available platforms include Free Music Archive available at http://freemusicarchive.org/.

77.    Upon information and belief, these publicly available platforms include MusicBrainz available at http://musicbrainz.org.

78.    The platforms identified in paragraphs 73-77 above - whether through a free tier or subscription - do not authorize mass reproduction or ingestion of songs for commercial AI training.

79.    Plaintiffs' songs can be found on all major music streaming platforms, including through Plaintiffs' own website, tonyjustice.com (the "Justice Website").

80.    Plaintiffs', Class Members', and Subclass Members' additionally distribute their songs through major music streaming platforms as well as their own websites.

81.    Suno copied Plaintiffs', Class Members', and Subclass Members' songs from the Internet.

82.    Suno trained its AI model on the songs belonging to Plaintiffs, Class Members, and

---

[16]    *See UMG Recordings, Inc. v. Suno, Inc.*, No. 1:24-cv-11611-FDS, Ans. at 8, Doc. No. 28 (D. Mass, Filed Aug. 1, 2024) ("It is no secret that the tens of millions of recordings that Suno's model was trained on presumably included recordings whose rights are owned by the Plaintiffs in this case").

Subclass Members.

83.    Without the unlawful copying of Plaintiffs', Class Members', and Subclass Members' songs and ingesting them into its AI model(s), Suno's service would not be able to produce the product that the Suno Website offers today to its 12,000,000 users.

84.    Suno's AI model(s) specifically trains on the expressive features (*i.e.*, the emotional and passionate aspects) of these songs for the ultimate purpose of usurping the listeners, fans, and potential licensees of the songs it copied.

85.    Suno used and/or accessed streaming services on which Plaintiffs, Class Members, and Subclass Members had licensed their songs to illegally copy and reproduce Plaintiffs', Class Members', and Subclass Members' songs for purposes of training its generative AI model(s).

86.    Suno never even attempted to seek permission from and give credit to independent music creators whose works make the Suno Website even possible, including Plaintiffs, Class Members, and Subclass Members.

87.    Suno profits substantially from its infringement of Plaintiffs', Class Members', and Subclass Members' songs.

88.    Suno has been valued at approximately Five Hundred Million Dollars ($500,000,000.00), with user subscription tiers as high as Thirty Dollars ($30.00) per month for its highest subscription tier.

89.    That massive financial success would not have been possible without independent music creator's songs that Suno copied to train its AI model, including copyrighted songs owned by Plaintiffs, Class Members, and Subclass Members.

90.    As discussed, Suno cannot avoid liability for its willful copyright infringement by claiming fair use.

91.    While the fair use doctrine allows for the unlicensed (*i.e.* illegal) use of copyrighted

works in very limited circumstances, none of which apply to Suno, even according to the U.S. Copyright Office.

92.     Plaintiffs, Class Members, and Subclass Members seek to hold Suno accountable for the misappropriation of their songs.

93.     Through both reproducing Plaintiffs' and Class Members' songs without license to train its AI model and through making new derivative works from their songs, Suno has violated under the Copyright Act exclusive rights held by Plaintiffs' and Class Members to copy and reproduce their songs, including the right to prepare derivative works.

94.     By reproducing Plaintiffs', Class Members' and Subclass Members' personas, voices, trademarks, likeness, signatures, brands, producer tags, and samples without license into the infringing works, Suno unfairly competed against Plaintiffs, Class Members, and Subclass Members and was unjustly enriched.

95.     Plaintiffs, Class Members, and Subclass Members do not assert that *every* output generated by Suno's AI model is an infringing work of their songs.

96.     Plaintiffs' claim is that *some* Suno-generated outputs are infringing works, verbatim or near-verbatim reproductions of Plaintiffs', Class Members', and Subclass Member songs (in part or in whole).

97.     Suno is liable for each and every output "sound-alikes," samples, producer tags, signatures, voice impersonations and other infringing works that actually copied protected expression and/or publicity rights of Plaintiffs, Class Members, and Subclass Members.

98.     As set forth below, evidence exists that Suno's AI model(s) has generated exact or nearly exact versions of Plaintiffs', Class Members', and Subclass Members' songs.

99.     Independent third-parties have documented and demonstrated that these are not isolated accidents but an actually occurring result of Suno's AI model.

100.    By this amended complaint, Plaintiffs, Class Members, and Subclass Members bolster their allegations of such copying and misappropriation and make clear that Suno's creation of the infringing works infringes Plaintiffs' rights in their songs containing both sound recordings and their underlying musical compositions, including their rights in derivative works of those recordings and compositions.

## THE PARTIES

101.    Plaintiff Justice is an independent country music artist who resides in the State of Tennessee.

102.    Plaintiff Justice is engaged in the business of creating, producing, manufacturing, distributing, selling, licensing, and otherwise commercializing his own original sound recordings in the United States and the world through various multi-media.

103.    5th Wheel Records is a Tennessee corporation with a principal office at 262 W. Broadway Blvd., Jefferson City, Tennessee 37760-2313. 5th Wheel Records publishes and/or administers musical compositions and sound recordings written by or associated with Plaintiff Justice and related catalogs, and holds or controls rights in such compositions and sound recordings, including those identified in Exhibit A.

104.    My Heartland is a Tennessee limited liability company with its principal office at 262 W. Broadway Blvd., Jefferson City, Tennessee 37760-2313. My Heartland publishes and/or administers musical compositions and sound recordings written by or associated with Plaintiff Justice and related catalogs, and holds or controls rights in such compositions and sound recordings, including those identified in Exhibit A.

105.    Plaintiffs hold copyrights to sound recordings and compositions that Plaintiff Justice created.

106.    As a holder of copyrights, Plaintiffs have exclusive control over rights in their

songs, which have significant economic value.

107.    A non-exhaustive list of specific sound recordings owned or exclusively controlled by Plaintiffs that Suno has, upon information and belief, illegally copied and reproduced is attached as Exhibit A.

108.    Plaintiffs currently commercially exploit, and at all relevant times have commercially exploited, all the sound recordings and underlying compositions listed in Exhibit A.

109.    Defendant Suno is a Delaware corporation with its principal place of business at 17 Dunster Street, Cambridge, Massachusetts 02138.

## JURISDICTION AND VENUE

110.    This is a civil action seeking damages and injunctive relief for infringement under the Copyright Act, 17 U.S.C. §§ 101, *et seq*. As such, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), based on federal question jurisdiction.

111.    This Court has personal jurisdiction over Defendant Suno because its principal place of business, listed as 17 Dunster Street, Cambridge, Massachusetts 02138, is in this district.

112.    Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Suno resides in this district.

## FACTUAL BACKGROUND

113.    Plaintiffs own or exercise exclusive control over copyrights and/or exclusive rights under federal law in and to numerous valuable songs. **Exhibit A**, attached hereto and incorporated herein by reference, contains a non-exhaustive, representative list of copyrighted sound recordings owned or exclusively controlled by Plaintiffs that Suno has directly infringed (the "Copyrighted Recordings").

114.    As an independent music creator, Plaintiff Justice has invested years cultivating an all-American unique image, musical style and lyrical form that has garnered a large and loyal fan

base.

115.    Plaintiff Justice is even credited as creating a new genre of "trucker music."

116.    Plaintiffs have made substantial investments in the creation, development and promotion of their musical catalogs and styles.

117.    Like Plaintiffs, the Class Members are music recording artists who own or exercise exclusive control over their copyrights and/or exclusive rights under federal law in and to countless songs.

118.    Like Plaintiffs, the Class Members have licensing deals and have invested in the creation, development and promotion of their music catalogs and brands.

119.    Subclass Members have released and commercially exploited their songs through recognized distribution channels and streaming platforms, but, due to financial hardship, physical or technological limitations that prevent them from completing the registration process, or other barriers such as lack of access to a computer or reliable internet, they have not obtained formal U.S. copyright registrations for their works.

120.    Subclass Members are not asserting federal copyright infringement claims under the Copyright Act. Instead, they seek relief under causes of action under the laws of the State of Tennessee, including unfair competition, unjust enrichment, and misappropriation, based on Suno's unauthorized commercialization of their brands, personas, likeness, trademarks, and songs in the training of Suno's AI model.

121.    Plaintiffs, Class Members, and Subclass Members have made substantial investments in their creative careers, cultivating unique musical identities (i.e., branded name and likeness signatures, such as producer tags), styles, and catalogs that embody their artistic contributions.

122.    Suno's exploitation of Plaintiffs', Class Members', and Subclass Members' songs

has deprived them of the opportunity to license and monetize their music in the free market, while allowing Suno to unjustly capture commercial value from their creative output without consent, license, or compensation.

123.    Suno's conduct constitutes misappropriation of Plaintiffs', Class Members', and Subclass Members' artistic identities.

124.    By copying and using their songs, brands, producer tags, voices, signatures, and samples without authorization, Suno diverted the economic value and goodwill those creators for Suno's own commercial enterprise.

125.    Upon information and belief, and consistent with the basic facts of how generative AI works, the content Suno used to train its AI model includes Plaintiffs' songs, as well as songs belonging to the Class Members and Subclass Members, that Suno reproduced without permission.

126.    Suno launched its public AI music generation platform in or about 2023.

127.    Users of Suno's service prompt the AI model to create music in various styles, mimicking particular instruments, genres, or even specific artists.

128.    As Suno's co-founder described, Suno's AI model was trained on a "mix of proprietary and public data."[17]

129.    Suno's representatives state that Suno's practices are "fairly in line with what other people are doing" in AI.[18]

130.    In truth, it is now evident what public data means in this context: Suno copied Plaintiffs', Class Members', and Subclass Members' songs *en masse* from the Internet and fed them into its AI training pipeline.

---

[17]    *See* UMG Recordings, Inc. v. Suno, Inc., No. 1:24-cv-11611 (D. Mass. June 24, 2024),  ECF No. 1. at pp. 3-4 (D. Mass, Filed Aug. 1, 2024) (citing @georg, Discord, Suno-General (Aug. 3, 2023).

[18]    Rachel Metz, The AI Music Era Is Here. Not Everyone Is a Fan, *Bloomberg* (May 6, 2024), https://www.bloomberg.com/news/articles/2024-05-06/suno-udio-and-more-the-ai-music-era-is-here-not-everyone-is-a-fan, last accessed September 2, 2025.

131. Suno's early investors candidly acknowledged the infringement at the heart of its model.

132. One investor admitted that if Suno "had deals with [record] labels when this company got started, I probably wouldn't have invested in it. I think that they needed to make this product without the constraints." [19]

133. In other words, Suno's business plan was premised on specifically not obtaining licenses or permissions ("constraints") for the music it used.

134. By avoiding "deals with labels" (and by extension, independent music creators), Suno was able to build its model faster and cheaper - at the expense of Plaintiffs, Class Members and Subclass Members - whose songs it took without consent.

135. Suno could *not* have built its AI model(s) capable of creating exact or almost exact songs so similar to Plaintiffs' copyrighted songs and the songs of the Class Members and Subclass Members without the initial act of training on their songs.

136. This explains why one of Suno's investors has publicly recognized that Suno's service is likely to spawn litigation and that defending lawsuits from music labels is "the risk we had to underwrite when we invested in the company."[20]

137. Since the launch of the Suno Website, many allegations have arisen of Suno AI songs resembling or otherwise almost exactly mimicking pre-existing songs, evidencing that such songs were included in Suno's training data.

138. Because of their sheer popularity and exposure, Plaintiff's copyrighted songs and the songs of the Class Members and Subclass Members had to be included within Suno's training

---

[19] Brian Hiatt, A ChatGPT for Music is Here. Inside Suno, the Startup Changing Everything, *Rolling Stone* (Mar. 17, 2024), available at https://www.rollingstone.com/music/music-features/suno-ai-chatgpt-for-music-1234982307/, last accessed September 2, 2025.

[20] Suno Could Get Sued by The Record Business. Who's backing It With $125M?, *Music Business Worldwide* (May 28, 2024, accessible at https://www.musicbusinessworldwide.com/suno-could-get-sued-by-the-record-business-whos-backing-it-with-125m/, last accessed September 2, 2025.

data for Suno's model to be successful at creating the desired human-sounding AI Music outputs.

139. Suno has admitted itself: "[i]t is no secret that the tens of millions of recordings that Suno's model was trained on presumably included recordings whose rights are owned by the Plaintiffs in this case."[21]

140. Suno goes on to admit that its "training data includes essentially all music files of reasonable quality that are accessible on the open Internet, abiding by paywalls, password protections, and the like, combined with similarly available text descriptions."[22]

141. Suno has admitted in the major label Lawsuit that its AI model trained on "essentially" all music files on the open Internet, so long as they were not "behind paywalls, password protections, and the like," and that it accessed available text descriptions for the songs.

142. This purported limitation related to paywalls and passwords, if true, does not shield Suno from liability.

143. For example, downloading or scraping recordings from streaming platforms such as YouTube – whether through a free tier or by paying a subscription fee – still constitutes unlawful access and copying.

144. YouTube, through its own Terms of Service, not only expressly prohibit this kind of conduct by its users (as discussed further herein), but YouTube additionally employs encryption and other technological efforts to try and prevent piracy of just this kind.

145. Accessing a platform pursuant to consumer-facing terms of service does not confer a license to reproduce or mass-ingest songs for commercial AI training to create an exact competing product.

146. To the contrary, the terms of music streaming platforms prohibit such uses, and

---

[21] *See UMG Recordings, Inc. v. Suno, Inc.*, No. 1:24-cv-11611-FDS, Answer of Defendant Suno, Inc. to Complaint at 8, Doc. No. 28 (D. Mass, Filed Aug. 1, 2024).
[22] *Id.* at 9.

Suno's wholesale reproduction of songs from those sources is unlawful and the circumvention of copyright protection systems as defined in 17 U.S.C. § 1201.

147.    Suno additionally admits to scraping and ingesting text data from online sources associated with the songs, which upon information and belief included artist names, producer credits, song titles, and other identifying information typically accompanying songs.

148.    By using that text data to train its AI model while stripping it from outputs, Suno misappropriated the value of Plaintiffs', Class Members', and Subclass Members' identities, denied them attribution, and enabled the commercial exploitation of their works without credit or compensation.

149.    By ingesting Plaintiffs', Class Members', and Subclass Members' songs into Suno's AI model(s), Suno deprived them of monetization, commercialization and licensing opportunities.

150.    During AI training, entire audio files are downloaded and stored (often in intermediate caches or libraries) so that the model can analyze them.

151.    The U.S. Copyright Office's Report confirms that "whatever the source, copies are made - often repeatedly" during the AI training process.[23]

152.    Each of those acts of copying is infringement unless authorized.

153.    Here, no Plaintiff, Class Member, or Subclass Member ever authorized Suno to download, store, reproduce, or otherwise use their songs for any purpose.

154.    Suno's mass copying thus infringed Plaintiffs' and Class Members' reproduction rights.

155.    Moreover, as explained below, Suno's subsequent use of those copies to generate new music implicates additional rights, including the rights to create derivative works and to

---

[23] U.S. Copyright Office, Copyright and Artificial Intelligence: Part 3 – Generative AI Training p. 26 (Pre-Publication Report, May 9, 2025)

distribute copies to the public.

156.    Plaintiffs' copyrighted songs and the songs of the Class Members and Subclass Members were all available on streaming services and the Internet during the applicable time Suno trained its AI model(s).

157.    The songs of Plaintiffs, Class Members, and Subclass Members were, without question, used in the training of Suno's AI model.

158.    Suno offers both free and paid versions of the Suno Website for the creation of AI Music.

159.    According to Suno's terms of service on the Suno Website, both free and paid users can use the AI Music for commercial purposes without restriction, with an additional requirement for free users to give credit to Suno.[24]

160.    The fact that Suno's AI model(s) has been documented on several separate occasions, and by different sources, mimicking – whether substantially or exactly - the songs, producer tags, signatures and voices contained in pre-existing songs,  supports the conclusion that Suno's AI model(s) produced infringing works containing the songs – whether in whole or in part – belonging to Plaintiffs, Class Members, and Subclass Members.

161.    These outputs also evidence that Suno copied songs belonging to Plaintiffs, Class Members, and Subclass Members into its AI training dataset.

162.    The existence of exact or nearly exact outputs copying pre-existing songs evidences Suno's intentional copyright infringement, as well as misappropriation of the accompanying names, text data, signatures, producer tags, voices and samples associated with those songs belonging to Plaintiffs, Class Members, and Subclass Members.

163.    By reproducing these distinctive identifiers, Suno has not only copied the

---

[24]    Suno Website, *Terms of Service* (June 30, 2024), https://suno.com/terms, last accessed June 11, 2025.

underlying recordings but also unfairly competed by exploited the personal and commercial identities of Plaintiffs, Class Members, and Subclass Members, diverting their value into Suno's own product without attribution, license, or compensation.

**Specific Allegations as to Each Registered Work in Exhibit A**

164.    Plaintiffs own *18 Gears to Life* — sound recording and musical composition; U.S. Copyright Office Reg. No. SR0000940659.

165.    Upon information and belief, Suno downloaded or otherwise obtained one or more partial or complete digital copies of *18 Gears to Life* from an internet available source.

166.    Upon information and belief, Suno stored *18 Gears to Life* on a digital device accessible non-transitory storage medium.

167.    Upon information and belief, Suno utilized *18 Gears to Life* in its training dataset for its AI model(s).

168.    Upon information and belief, Suno's AI model(s) continues to have memorized representations of *18 Gears to Life* in its AI model(s) datasets, caches, checkpoints, and weights.

169.    Upon information and belief, Suno continues to store *18 Gears to Life* on a digital device accessible non-transitory storage medium.

170.    Plaintiffs own *A Merry Trucking Christmas* — sound recording and musical composition; Reg. No. SRu001456089.

171.    Upon information and belief, Suno downloaded or otherwise obtained one or more partial or complete digital copies of *A Merry Trucking Christmas* from an internet available source.

172.    Upon information and belief, Suno stored *A Merry Trucking Christmas* on a digital device accessible non-transitory storage medium.

173.    Upon information and belief, Suno utilized *A Merry Trucking Christmas* in its training dataset for its AI model(s).

174.    Upon information and belief, Suno's AI model(s) continues to have memorized representations of *A Merry Trucking Christmas* in its AI model(s) datasets, caches, checkpoints, and weights.

175.    Upon information and belief, Suno continues to store *A Merry Trucking Christmas* on a digital device accessible non-transitory storage medium.

176.    Upon information and belief, *Life on 18 Whe*els — sound recording and musical composition; Reg. No. SR0000940595.

177.    Upon information and belief, Suno downloaded or otherwise obtained one or more partial or complete digital copies of *Life on 18 Wheels* from an internet available source.

178.    Upon information and belief, Suno stored *Life on 18 Wheels* on a digital device accessible non-transitory storage medium.

179.    Upon information and belief, Suno utilized *Life on 18 Wheels* in its training dataset for its AI model(s).

180.    Upon information and belief, Suno's AI model(s) continues to have memorized representations of *Life on 18 Wheels* in its AI model(s) datasets, caches, checkpoints, and weights.

181.    Upon information and belief, Suno continues to store *Life on 18 Wheels* on a digital device accessible non-transitory storage medium.

182.    Plaintiffs own *War Paint* — sound recording and musical composition; Reg. No. SRu001504667.

183.    Upon information and belief, Suno downloaded or otherwise obtained one or more partial or complete digital copies of *War Paint* from an internet available source.

184.    Upon information and belief, Suno stored *War Paint* on a digital device accessible non-transitory storage medium.

185.    Upon information and belief, Suno utilized *War Paint* in its training dataset for its

AI model(s).

186.    Upon information and belief, Suno's AI model(s) continues to have memorized representations of *War Paint* in its AI model datasets, caches, checkpoints, and weights.

187.    Upon information and belief, Suno continues to store *War Paint* on a digital device accessible non-transitory storage medium.

188.    Plaintiffs own *West Coast Turnaround* — sound recording and musical composition; Reg. No. SR0000940660.

189.    Upon information and belief, Suno downloaded or otherwise obtained one or more partial or complete digital copies of *West Coast Turnaround* from an internet available source.

190.    Upon information and belief, Suno stored *West Coast Turnaround* on a digital device accessible non-transitory storage medium.

191.    Upon information and belief, Suno utilized *West Coast Turnaround* in its training dataset for its AI model(s).

192.    Upon information and belief, Suno's AI model(s) continues to have memorized representations of *West Coast Turnaround* in its AI model(s) datasets, caches, checkpoints, and weights.

193.    Upon information and belief, Suno continues to store *West Coast Turnaround* on a digital device accessible non-transitory storage medium.

194.    Plaintiffs own *Wild Days* — sound recording and musical composition; Reg. No. SR0000940492 ("*Wild Days* '*492*").

195.    Upon information and belief, Suno downloaded or otherwise obtained one or more partial or complete digital copies of *Wild Days '492* from an internet available source.

196.    Upon information and belief, Suno stored *Wild Days '492* on a digital device accessible non-transitory storage medium.

197.    Upon information and belief, Suno utilized *Wild Days '492* in its training dataset for its AI model(s).

198.    Upon information and belief, Suno's AI model(s) continues to have memorized representations of *Wild Days '492* in its AI model(s) datasets, caches, checkpoints, and weights.

199.    Upon information and belief, Suno continues to store *Wild Days '492* on a digital device accessible non-transitory storage medium.

200.    Plaintiffs own *Wild Days* — sound recording and musical composition (alternate registration/version); Reg. No. SR0000941484. ("*Wild Days '484*").

201.    Upon information and belief, Suno downloaded or otherwise obtained one or more partial or complete digital copies of *Wild Days '484* from an internet available source.

202.    Upon information and belief, Suno stored *Wild Days '484* on a digital device accessible non-transitory storage medium.

203.    Upon information and belief, Suno utilized *Wild Days '484* in its training dataset for its AI model(s).

204.    Upon information and belief, Suno's AI model(s) continues to have memorized representations of *Wild Days '484* in its AI model(s) datasets, caches, checkpoints, and weights.

205.    Upon information and belief, Suno continues to store *Wild Days '484* on a digital device accessible non-transitory storage medium.

206.    Plaintiffs own *Center Lane Larry* — sound recording and musical composition; Reg. No. SRu1496009 (Mar. 7, 2022).

207.    Upon information and belief, Suno downloaded or otherwise obtained one or more partial or complete digital copies of *Center Lane Larry* from an internet available source.

208.    Upon information and belief, Suno stored *Center Lane Larry* on a digital device accessible non-transitory storage medium.

209.    Upon information and belief, Suno utilized *Center Lane Larry* in its training dataset for its AI model(s).

210.    Upon information and belief, Suno's AI model(s) continues to have memorized representations of *Center Lane Larry* in its AI model datasets, caches, checkpoints, and weights.

211.    Upon information and belief, Suno continues to store *Center Lane Larry* on a digital device accessible non-transitory storage medium.

212.    Plaintiffs own *Long Distance Love* — sound recording and musical composition; Reg. No. SRu1451987.

213.    Upon information and belief, Suno downloaded or otherwise obtained one or more partial or complete digital copies of *Long Distance Love* from an internet available source.

214.    Upon information and belief, Suno stored *Long Distance Love* on a digital device accessible non-transitory storage medium.

215.    Upon information and belief, Suno utilized *Long Distance Love* in its training dataset for its AI model(s).

216.    Upon information and belief, Suno's AI model(s) continues to have memorized representations of *Long Distance Love* in its AI model(s) datasets, caches, checkpoints, and weights.

217.    Upon information and belief, Suno continues to store *Long Distance Love* on a digital device accessible non-transitory storage medium.

218.    Plaintiffs own *Song of My People* — sound recording and musical composition; Reg. No. SR0000944803.

219.    Upon information and belief, Suno downloaded or otherwise obtained one or more partial or complete digital copies of *Song of My People* from an internet available source.

220.    Upon information and belief, Suno stored *Song of My People* on a digital device

accessible non-transitory storage medium.

221.    Upon information and belief, Suno utilized *Song of My People* in its training dataset for its AI model(s).

222.    Upon information and belief, Suno's AI model(s) continues to have memorized representations of *Song of My People* in its AI model(s) datasets, caches, checkpoints, and weights.

223.    Upon information and belief, Suno continues to store *Song of My People* on a digital device accessible non-transitory storage medium.

224.    Plaintiffs own *Driving in a Downpour* — sound recording and musical composition; Reg. No. SR0000944279.

225.    Upon information and belief, Suno downloaded or otherwise obtained one or more partial or complete digital copies of *Driving in a Downpour* from an internet available source.

226.    Upon information and belief, Suno stored *Driving in a Downpour* on a digital device accessible non-transitory storage medium.

227.    Upon information and belief, Suno utilized *Driving in a Downpour* in its training dataset for its AI model(s).

228.    Upon information and belief, Suno's AI model(s) continues to have memorized representations of *Driving in a Downpour* in its AI model(s) datasets, caches, checkpoints, and weights.

229.    Upon information and belief, Suno continues to store *Driving in a Downpour* on a digital device accessible non-transitory storage medium.

### The United States Copyright Office Report

230.    As noted, the United States Copyright Office recently released its Pre-Publication Version of its Report on generative AI training in May of 2025.[25]

---

[25] United States Copyright Office, *Copyright and Artificial Intelligence, Part 3: Generative AI Training*, https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-3-Generative-AI-Training-Report-Pre-

231.    The United States Copyright Office administers the nation's copyright laws and through its work, the United States Copyright Office "is committed to helping fulfill copyright's Constitutional purpose and to promote creativity and free expression for the benefit of all."[26]

232.    "The Register of Copyrights is the principal advisor to Congress on national and international copyright matters, testifying upon request and providing ongoing leadership and impartial expertise on copyright law and policy."[27]

233.    The Report indicates that Suno's use of Plaintiffs' and the Class Members' copyrighted songs violates copyright protections.

234.    Specifically, the Report states that "The steps required to produce a training dataset containing copyrighted works clearly implicate the right of reproduction."[28]

235.    With respect to this copying, the Report states, "Developers make multiple copies of works by downloading them; transferring them across storage mediums; converting them to different formats; and creating modified versions or including them in filtered subsets.

236.    In many cases, the first step is downloading data from publicly available locations, but whatever the source, copies are made—often repeatedly."[29]

237.    According to the Report, "Most commenters agreed with or did not dispute that copying during the acquisition and curation process implicates the reproduction right."[30]

238.    Suno downloaded the songs of Plaintiffs, Class Members, and Subclass Members to train its generative AI model.

239.    Suno used the songs of Plaintiffs, Class Members, and Subclass Members to train its generative AI model(s).

---

Publication-Version.pdf (last viewed June 11, 2025)
[26]    United States Copyright Office, "About," https://www.copyright.gov/about/ (last viewed June 11, 2025).
[27] *Id.*
[28] Report at 26.
[29] *Id.*
[30] *Id.* at 27.

240.    With respect to training and whether this creates a claim for copyright infringement, the Report states, "[t]he training process also implicates the right of reproduction. First, the speed and scale of training requires developers to download the dataset and copy it to high-performance storage prior to training. Second, during training, works or substantial portions of works are temporarily reproduced as they are 'shown' to the model in batches. Those copies may persist long enough to infringe the right of reproduction, depending on the model at issue and the specific hardware and software implementations used by developers. Third, the training process— providing training examples, measuring the model's performance against expected outputs, and iteratively updating weights to improve performance—may result in model weights that contain copies of works in the training data. If so, then subsequent copying of the model weights, even by parties not involved in the training process, could also constitute prima facie infringement."[31]

241.    Meaning, as it relates to Plaintiffs and Class Members, the process in which Suno's AI model trained, through the reproduction and copying of their existing copyrighted songs, constitutes prima facie copyright infringement.

242.    With respect to similarities between Suno's infringing works that are similar to Plaintiffs' and Class Members' copyrighted songs, the Report indicates that a "lookalike" end product evinces that the generative AI model is in fact storing and utilizing the copyrighted songs.

243.    This matters for music creators who never gave permission to Suno, because their songs are now stored in the neural network of Suno's AI, and cannot be retrieved, deleted, or scrubbed from Suno's use.

244.    The Report goes on to note that "a specific model can generate verbatim or substantially similar copies of a training example, without that expression being provided externally in the form of a prompt or other input, it must exist in some form in the model's

---

[31] *Id.* at 27–28.

weights."[32]

245.    Meaning, AI, without robust filters, can and has replicated with near exactness copies of copyrighted songs, even with limited prompts or inputs by a Suno user.

246.    This was also evidenced in thousands of instances by the major record labels in their Lawsuit against Suno.

247.    In the Report, the Copyright Office opined that "[t]here is a strong argument that copying the model's weights implicates the right of reproduction for the memorized examples. Like other digital files that encode or compress content using mathematical representations, the content need not be directly perceivable to constitute a copy."[33]

248.    Moreover, the Report states, "[s]ince model weights are lists of numbers that do not change (barring further training), they are fixed, and because memorized works can be generated and displayed using software, those works can be perceived or reproduced with the aid of a machine."[34]

249.    When a generative AI model(s) such as Suno's produces "near exact replicas" of sound recordings, the Report states "[s]uch outputs likely infringe the reproduction right and, to the extent they adapt the originals, the right to prepare derivative works."[35]

250.    The Report concluded by emphasizing that the fair use doctrine *does not* excuse unauthorized training on expressive works (e.g., music) *particularly when those works are used to generate substitutional outputs* that may replace the originals in the relevant marketplace.[36]

251.    Here, Suno training its AI model(s) on the songs of Plaintiffs and Class Members, to then create competing music in the exact same marketplace, is unlikely to be considered fair

---

[32] *Id.* at 28.
[33] *Id.*
[34] *Id.* at 28–29.
[35] *Id.* at 31.
[36] *Id.* 107-108.

use, and is therefore prima facie copyright infringement.

**Suno's Outputs Resemble and Outright Replicate Protected Works**

252.    After training its AI model(s) on Plaintiffs', Class Members', and Subclass Members' songs, Suno deployed its AI model(s) to generate new AI Music.

253.    Separate independent sources show that Suno's outputs often closely imitated or replicated specific existing songs or artist identifiers.

254.    For example, the major record labels in their Lawsuit documented numerous instances of Suno's AI outputting songs that are almost identical to their own sound recordings.

255.    The striking similarity between Suno's AI outputs and well-known classic songs is so pronounced that it is difficult to appreciate fully without listening to the recordings themselves (which audio files of the AI versions were hyperlinked in the major record label's Complaint, and included hereto by reference).

256.    The outputs sound so shocking close to the originals that you must hear it to believe it.

257.    Using these examples here, the plaintiffs presented evidence that Suno's model generated AI Music indistinguishable from Chuck Berry's classic "Johnny B. Goode" not just once, but some twenty-seven (27) times (the "Johnny B. Goode Outputs").[37]

258.    These Johnny B. Goode Outputs appeared to copy the essential and immediately recognizable melodies and arrangements of the original "Johnny B. Goode" song.[38]

259.    Similarly, Suno's AI model generated ten (10) different outputs that resemble Bill Haley & His Comets' "Rock Around the Clock."[39]

260.    The output contains four (4) lines at the beginning that are very similar to the

---

[37] *UMG Recordings, Inc. et al. v. Suno, Inc.*, No. 1:24-cv-11611 (D. Mass. June 24, 2024), Doc. No. 1. at pp. 16-18; listen to one such example, "Deep down in Louisiana close to New Orle," last accessed September 9, 2025.
[38] *Id*.
[39] *Id*., ¶ 56 at 19.

original, with identical pitches and rhythm in many places. It also uses a melody later in the output on the phrase "we're gonna rock around the clock tonight," which is virtually identical to the melody of the original.[40]

261.    Suno also generated ten (10) different outputs that contain a famous melody similar to one found in Jerry Lee Lewis' "Great Balls of Fire."[41]

262.    One (1) such output includes the well-known, characteristic large vocal leap up to the word "great" in the line "Goodness gracious, great balls of fire." This line also replicated the rhythm of the original and follows a similar melodic shape.[42]

263.    Suno's AI model also generated six (6) different outputs that contain portions of B.B. King's "The Thrill is Gone."[43]

264.    The first phrase in the output, "the thrill is gone," uses identical pitches to those used in the third occurrence of this phrase in the original sound recording. The second phrase, "the thrill has gone away," is also very similar to the same phrase in the original.[44]

265.    As yet another example, Suno's AI model generated AI Music with portions that are strikingly similar to the famous Michael Bublé's hit "Sway", with an identical version of the distinctive opening on the words "when marimba rhythms," virtually identical rhythm throughout, and repeated instances of the original's characteristic three-note descending figure.[45]

266.    Suno's AI model generated eleven (11) additional outputs resembling "Sway."[46]

---

[40] *Id.*; listen to one such example, "One, Two, Three O'Clock, Four O'Clock," last accessed September 9, 2025.
[41] *Id.*, ¶ 59 at 21.
[42] *Id.*; listen to one such example, "You shake my nerves and you rattle my br.," last accessed September 9, 2025.
[43] *Id.*, ¶ 60 at 21; listen to one such example, "The Thrill is Gone," last accessed September 9, 2025.
[44] *Id.* at 22.
[45] *Id.*, ¶ 61 at 22; listen to one such example, "When marimba rhythms start to play," last accessed September 9, 2025.
[46] *Id.*

267.    These examples demonstrate that Suno's AI had memorized those original works and reproduced them in new form.

268.    Even without using prompts that reference a particular artist, genre, and other identifying features, Suno would generate outputs that closely match copyrighted songs.

**Suno Reproduces Producer Tags & Samples**

269.    While even less targeted prompts, for example, simply asking for a song in the style of a particular artist, Suno has produced music that resembles and appears to outright replicate specific recordings by that artist.[47]

270.    Such outputs are clear evidence that Suno trained its model on Plaintiffs', Class Members', and Subclass Members' songs.

271.    These outputs are not original creations by Suno, but rather new versions built upon and derived from existing songs. In the music industry, such uses are commonly understood as "derivative works," "sampling," or "interpolations," all of which require authorization through licensing from the underlying rights holders.

272.    Beyond mere copying of melodies and arrangements, Suno's AI model has also produced verbatim audio elements from original recordings.

273.    Notably, multiple Suno-generated tracks have contained famous producer tags – the distinctive audio stingers or spoken phrases that producers often embed at the start of songs as a brand or creator identifier (similar to signing a painting).

274.    For example, the Suno-generated track "Rains of Castamere" by Suno user Natale Galante starts with the famous "CashMoneyAP" producer tag, despite the prompt for this AI-created music file making no mention of that producer nor the words "Cash Money

---

[47] Jason Nelson, *Music Industry Giants Sue AI Music Services Udio and Suno*, *Decrypt* (June 24, 2024), available at https://decrypt.co/236809/ai-music-riaa-lawsuit-suno-udio-industry-copyright (quoting an RIAA spokesperson that "simple prompts mentioning an artist and their work produce recordings that 'overwhelmingly mimic and replicate specific recordings' by those artists or their voices, style, and sound.")

AP".

275.    This suggests a strong probability that Suno's system was trained on audio recordings associated with or containing the CashMoneyAP producer tag, which appears in various songs such as DaBaby and Pop Smoke.

276.    CashMoneyAP is a source identifier and trademark for music producer, Alex Christian Jean Petit, known professionally as CashMoneyAP.

277.    The reproduction of producer tags and samples in Suno's outputs is copyright infringement as unauthorized derivative works.

278.    The reproduction of producer tags in Suno's outputs, including performer names, stage names, and unique catch phrases appropriates artists' personas and brands without authorization.

279.    These name-drops are not random noises – they are highly distinctive phrases that real artists/producers use to identify themselves, now appearing in AI Music without authorization.

280.    Such uses trade on the persona and brand goodwill of those artists and producers, effectively "borrowing" their identity to lend credibility or familiarity to Suno's outputs.

281.    Because producer tags function as brand identifiers and source designations, their reproduction is likely to cause confusion as to sponsorship, affiliation, or endorsement.

282.    Such uses trade on the persona and brand goodwill of those artists and producers, effectively "borrowing" their identity to lend credibility or familiarity to Suno's outputs.

283.    The artist Jason Derulo is known for singing his own name at the beginning of his songs.[48]

284.    Suno also replicated this tag, notably including "Jason Derulo" in a way

---

[48] G. Garner, Jason Derulo Reveals Why He Started Singing His Name at the Beginning of His Songs Again: 'I Had to Bring That Back', *Daily Mail*, Oct. 16, 2020, https://www.dailymail.co.uk/tvshowbiz/article-8849659/Jason-Derulo-reveals-started-singing-songs-bring-back.html; last accessed September 9, 2025.

substantially similar to the Jason Derulo tag.

285.    Even in approximately the last three (3) months, and following the upgraded Suno 4.5 AI model, Suno reproduced the producer tag, <u>Zaytoven</u>.

286.    Xavier Lamar Dotson is a music producer professionally known as Zaytoven.

287.    Zaytoven is a brand identifier for Mr. Dotson.

288.    With only the prompt "A chopped and screwed Memphis Hip Hop modern trap anthem, Chorus vocals are pitched extremely low, male rapper with a southern drawl, bells and synths", Suno's AI model generated an output immediately performing "Zaytoven".

289.    The original Zaytoven producer tag notably features a female child's voice.

290.    The Suno output performance of Zaytoven not only contains the word "Zaytoven," but additionally features the performance by a female child.

291.    These infringements by Suno appear to be ongoing.

292.    To the extent Suno claims these producer tags are only imitations - and not outright duplications of actual recordings - these are nonetheless derivative works and evidence that Suno AI model misappropriates the persona of musical artists as a built-in feature of its product.

293.    Additional independent sources corroborate this issue of producer tags and samples outputs by Suno's AI model.

294.    In a separate video exposé on Youtube by a creator *Sync My Music* entitled <u>Is Suno Sampling Copyrighted Producer Tags? (Audio Examples)</u>, a music industry commentator and expert played audio generated by Suno's model from Suno users who had also documented producer tags appearing in their Suno outputs. [49]

295.    Most tellingly to why Plaintiffs, Class Members, and Subclass Members believe Suno regularly produced AI Music containing their songs (and continues to today) – whether exact

---

[49] Sync My Music, Is Suno Sampling Copyrighted Producer Tags? (YouTube video, Jul 3, 2024), available at https://www.youtube.com/watch?v=DBir0ugZZvo

or almost exact – the producer tag examples appeared in Suno outputs without any user prompt to do so in most instances.

296.    These outputs are not coincidental or generic.

297.    Suno produced outputs containing an exact or almost exact replica of the "Honorable C.N.O.T.E." producer tag.[50]

298.    Carlton Davis Mays Jr., the stage name of Carlton Mays, Jr., is a hip hop producer and songwriter professionally identified by his Honorable C.N.O.T.E. producer tag.

299.    Suno produced outputs containing an exact or almost exact replica of the "Tahj Money" producer tag.[51]

300.    Tahj Javal Vaughn is a hip-hop producer professionally known as Tahj Money.

301.    Suno produced outputs containing an exact or almost exact replica of the "Mustard on the beat Hoe!" producer tag.[52]

302.    Dijon McFarlane, known professionally as DJ Mustard, is a record producer and beatmaker and identified by his producer tag, Mustard on the beat, Hoe.

303.    Suno produced outputs containing an exact or almost exact replica of the "Mike Will Made It" producer tag.[53]

304.    Michael Len Williams II is a music producer known professionally as Mike Will Made It.

305.    Suno produced outputs containing an exact or almost exact replica of the "Oh my God, Ronny" producer tag.[54]

306.    Ronald Oneil Spence, Jr. is a music producer professionally associated with his

---

[50] *Id.* at 5:21 minutes.
[51] *Id.* at 5:23.
[52] *Id.* at 5:34.
[53] *Id.* at 5:44.
[54] *Id.* at 5:58.

producer tag, Oh my God, Ronny.

307.    Suno produced outputs containing an exact or almost exact replica of the "Young Chop On The Beat" producer tag.[55]

308.    Tyree Lamar Pittman, professionally known as Young Chop, is a music producer associated with his producer tag, Young Chop On The Beat.

309.    Suno produced outputs containing an exact or almost exact replica of the "We The Best Music Another One DJ Kahled" producer tag.[56]

310.    Khaled Mohammed Khaled is a music producer professionally associated with the producer tag, We The Best Music Another One DJ Kahled.

311.    In one instance, a Suno user entered producer tag words as lyrics with only the prompt "trap," and the resulting AI output remarkably matched the actual performance of the producer tag(s) exactly or almost exactly.[57]

312.    Meaning, not only was the melodic the intention (i.e., the timing of the performance) of the replicated producer tags exact or almost exact, but the chosen voices for each matched the original exactly or almost exactly.[58]

313.    In this example, the Suno output voice changed from producer tag to producer tag.

314.    Upon information and belief, Suno's AI model actively matched prompts with the producer tags contained in the original songs trained on by Suno's AI model.

315.    In another example, producer duo Take a Daytrip, comprised of Denzel Baptiste and David Biral, have a producer tag "Daytrip Took It To Ten."[59]

316.    The Daytrip Took It To Ten has a distinct stutter in the performance of the producer

---

[55] *Id*. at 6:06.
[56] *Id*. at 6:14.
[57] *Id*. at 6:54.
[58] *Id*.
[59] *Id*. at 7:48.

tag.

317.    Of the ten (10) Suno outputs, seven (7) contained the stutter effect.[60]

318.    To the naked ear, these reproduced tags appear to verbatim copies of the originals, not a mere sound alike.

319.    However, even in the instances the producer tags sounded very similar, but slightly different in the tone of voice – for example – the intonation, performance and emphasis nonetheless remained the same, indicating Suno's AI had instead produced an almost exact look-alike version of the producer sample.[61]

### Suno Creates Soundalike Voices

320.    These glaring examples cannot be ignored, despite Suno's continued argument that Suno is not designed to sample or otherwise create lookalike songs.[62]

321.    These examples include now not just sampling, producer tag reproductions, interrelations of immediately recognizable songs, but Suno has also allegedly generated vocals of music creators without their awareness or permission.

322.    Industry analysts found that Suno-generated vocals can closely mimic the sound of well-known artists like Lin-Manuel Miranda, Bruce Springsteen, Michael Jackson, and even the group ABBA.[63]

323.    Users in the Suno community have similarly reported that the AI will sometimes ignore a given prompt and instead generate vocals "that sound way too close" to certain famous singers (e.g. producing Juice WRLD or Young Thug vocals)[64] strongly suggesting the model was

---

[60] *Id.*

[61] *Id.* at 7:02.

[62] Doc. 22 at p.4 (Suno's guardrails "are specifically designed to prevent outputs from sounding too much like any given recording the model was trained on."

[63] Reuters, *Major music labels sue AI companies over copyright infringement* (June 24, 2024), available at https://www.reuters.com/technology/artificial-intelligence/music-labels-sue-ai-companies-suno-udio-us-copyright-infringement-2024-06-24/, last accessed September 2, 2025.

[64] Comment by unknown author on *Has anyone else experienced a producer tag?*, r/SunoAI, Reddit (May 2023), https://www.reddit.com/r/SunoAI/comments/1cy6ck3/has_anyone_else_experienced_a_producer_tag/?utm_source=

trained on those artists' actual recordings.

324.    These vocal reproductions provide yet another clear example that Suno is not creating original works, but rather competing AI Music designed to mimic the very recordings it was trained on.

325.    Suno's own executives are well aware of the AI cloning issue, and yet pretend it does not exist, claiming Suno is "not built that way."

326.    Co-founder and CEO Mikey Shulman admitted that Suno's model already has the ability to produce outputs that replicate real artists' vocals and songs – so much so that the company is "holding back" on letting users generate exact replicas until "the licensing climate is a little less uncertain".[65]

327.    Suno, by the words of its very own CEO, already knows its technology can exactly mimic voices, signature performances, producer tags, samples and songs of Plaintiffs, Class Members and Subclass Member indistinguishably.

328.    While Suno says it has postponed offering a full voice-cloning feature due to the legal implications, Suno's current outputs have demonstrated convincingly Suno's AI model in fact has already been outright duplicating Plaintiffs', Class Members' and Subclass Members' songs, likeness, signatures and other protected elements and source identifiers.

329.    Plaintiffs, Class Members and Subclass Member assert that Suno did this intentionally in order to create a top-of-the-line AI model that was able to compete with the top songs of the world with just a few simple prompts by users.

---

share&utm_medium=web3x&utm_name=web3xcss&utm_term=1&utm_content=share_button
[65] Michael Mignano, Interview with Mikey Shulman (Suno CEO), at 43:55–44:53, posted on X (Twitter) (Mar. 8, 2024), available at https://x.com/mignano/status/1766151562299163030 (Shulman: Suno's model can already produce outputs that replicate real artists' vocals [in the CEO's example, Taylor Swift]  but the company is "holding back" offering exact voice cloning until the "licensing climate is a little less uncertain").; *See Also* Making Transformers Sing - with Mikey Shulman of Suno, Latent Space (Mar. 14, 2024), https://www.latent.space/p/suno (last visited Sept. 1, 2025).

330.    Whether the reproductions arise from intentional design or from a known failure mode (such as overfitting – to be discussed herein), the legal result is the same: Suno's outputs contain protected expression drawn from the training data set.

331.    The very purpose of sampling, interpolation, or intentionally mimicking (or outright copying) hit songs - when done by human creators - is because it significantly elevates the likelihood of creating a new hit and heightening user satisfaction.

332.    A study titled **"Sampling Increases Music Sales: An Empirical Copyright Study"** found that original tracks which are sampled in new works enjoy *statistically significant increases in sales*—especially when the sample includes lyrics or appears pervasively in the new song— suggesting that reuse of well-known material boosts both the sampled and the original.[66]

333.    Suno intended to blur the line between genuine music, heightening the likelihood that listeners will be misled into believing an AI Music is an authorized or endorsed work by Plaintiffs, Class Members, and Subclass Members.

334.    By generating outputs that imitate the distinctive voices, styles, and performances of Plaintiffs, Class Members and Subclass Members, Suno positioned its AI model to produce substitute tracks that directly compete in the marketplace with the original works and performers, while relying on the unauthorized use of those songs to do so.

**The Conduct of Suno's Representative**

335.    In or about late May 2025, Suno rolled out a "Remix" feature that allows users to upload or select existing tracks and generate new versions as "Covers", "Extends", or "Reuse Prompt" remixes (i.e., new versions of what the user uploaded to Suno or otherwise created on Suno).

336.    A senior Suno representative, reported to be the official strategic advisor to Suno,

---

[66] *Sampling Increases Music Sales: An Empirical Copyright Study,* August 4, 2018, 56 American Business Law Journal 177 (2019), available at SSRN: https://ssrn.com/abstract=3226292, last accessed September 2, 2025.

Timothy Zachery Mosley (artistically known as "Timbaland"), where he would be involved in the "day-to-day product development" and "creative direction" of Suno.[67]

337.    Timbaland not only oversaw product development and strategic creative direction, but would be involved all new Suno generative music tools.[68]

338.    While serving in this prominent role with Suno, Timbaland appeared in a video uploading a track belonging to music producer, Kuddie Fresh (also known as "K Fresh") to Suno and releasing an unauthorized AI remix.

339.    Suno's own senior representative Timbaland enabled and encouraged the ingestion and transformation of others' recordings into "new" version without license, credit, or compensation.

340.    The episode became viral and prompted an open letter from K Fresh and his counsel, Ryan Schmidt,[69] followed by Timbaland's public apology acknowledging he used K Fresh's music without consent.[70]

341.    In the public statements responding to the incident, Timbaland and his attorney contended that what Timbaland did "did not violate the law."[71]

342.    This conduct of downloading and inputting songs belonging to Plaintiffs, Class Members, and Subclass Members so openly and publicly underscores the very misconduct alleged against Suno herein.

---

[67] Timbaland Becomes Strategic Advisor For AI Music Company Suno, *Billboard*, October 22, 2024, available at https://www.billboard.com/pro/timbaland-strategic-advisor-ai-music-company-suno/, last accessed September 5, 2025.

[68] Suno, With a $500M Valuation, Has Admitted Training Its AI on Copyrighted Music. It Just Named Timbaland as A Strategic Advisor, *Music Business Worldwide*, October 22, 2024, available at https://www.musicbusinessworldwide.com/suno-with-a-500m-valuation-has-admitted-training-its-ai-on-copyrighted-music-it-just-named-timbaland-as-a-strategic-advisor1/, last visited September 5, 2025.

[69] Open Letter, Dear Suno and Timbaland, Do Better, June 20, 2025, available at https://www.instagram.com/p/DLIXniVMwfn/?img_index=1, last visited September 5, 2025.

[70] Statement from Timbaland, Instagram, June 20, 2025, available at https://www.instagram.com/p/DLIpBQGOUUo/?img_index=1, last visited September 5, 2025.

[71] *Id.*, *see* slide 2, Statement from Tynia Coats, Esq.

343.    It demonstrates that even Suno's own senior leadership has engaged in and normalized the unauthorized use of others' copyrighted works, converting those songs into "new" versions without license.

344.    Such actions not only constitute copyright infringement, but also unfair competition, as they divert value, attribution, and market opportunities away from the rightful creators.

345.    Suno's own representatives continue to engage in this behavior today, further confirming that Suno has intentionally structured its business to profit from the intentional misappropriation of music creators' works.

### AI Overfitting

346.    AI experts document the occurrence of "overfitting" in AI models resulting in the regurgitations of the original training data.

347.    *Overfitting* is the technical term for a model reproducing chunks of its training examples (i.e., regurgitating its data set in outputs).

348.    Overfitting is defined by learning training examples too intricately, so that it "fits (memorizes) the training set so tightly that the model replicates data" rather than making new data."[72]

349.    When an AI model is overfit, it may literally spit out parts of its training data rather than produce new output.

350.    In the generative AI architecture, the type of verbatim or near-verbatim training data output is usually called "regurgitation."

351.    One of the trustworthy glossaries explains that memorization (partial recall of items word-for-word) is a form of "partial regurgitation," while regurgitation, on the other hand, is when

---

[72] Overfitting, in Machine Learning Crash Course, Google for Developers, https://developers.google.com/machine-learning/crash-course/overfitting/overfitting, last visited September 1, 2025.

[a model] repeats verbatim textual parts from [its] training data."[73]

352.    Even though Suno's output is sound rather than text, the pattern is the same: Suno is generating copyrighted sounds it was taught in training.

353.    Suno's generation of producer tags, samples, music creator vocals, signatures, and the reproduction of underlying compositions into new AI Music could be this very failure mode, if not specifically by Suno's design for its AI model(s).[74]

354.    These examples of Suno's outputs qualify as new versions based on the old, commonly referred to in the music industry as "sampling" or "interpolation."

355.    By lifting distinctive melodies, arrangements, or sonic signatures from existing songs and re-presenting them in slightly altered form, Suno's AI is engaging in the same practices that have long required licenses in traditional music production.

356.    The difference is that Suno has taken these elements without authorization, embedding them into its model and reproducing them at scale under the guise of "AI-generated" output.

357.    Given Suno's own bold admissions to date that it ingested "essentially all music files of reasonable quality" available online, combined with the mounting evidence of its outputs, Plaintiffs, Class Members, and Subclass Members have a good-faith basis to believe that Suno always intended to take and recreate their works without authorization or compensation in order to create the best AI Music possible.

358.    Suno intentionally structured its AI model to generate AI Music designed to mirror

---

[73] Data, in Yeong Zee Kin, Nature of Data in Pre-Trained Large Language Models, FPF (July 6, 2025), https://fpf.org/blog/nature-of-data-in-pre-trained-large-language-models/ (last visited Sept. 1, 2025).
[74] The Intended or Common Behavior, in Cbresciano, A Technical Critique of Jacqueline Charlesworth's "Generative AI's Illusory Case for Fair Use", Medium (Jun. 23, 2025), https://medium.com/@cbresciano/a-technical-critique-of-jacqueline-charlesworths-generative-ai-s-illusory-case-for-fair-use-3aef5bf20107 (last visited Sept. 1, 2025).

the very songs it trained on - including the underlying compositions, vocal performances, producer

tags, and samples.

359.    Plaintiffs, Class Members, and Subclass Members further have a good-faith basis

to believe that, just as Suno has reproduced classic catalog works verbatim or nearly verbatim, it

has likewise generated unauthorized derivative works, samples, and identifiers drawn from the

music of Plaintiffs, Class Members, and Subclass Members.

**Suno Downloaded Songs from Protected Platforms**

360.    Upon information and belief, Suno obtained many – if not all – of the songs in its

training data by unlawfully downloading them from the website YouTube, located at

www.youtube.com ("YouTube") through a method of music piracy called "stream ripping".

361.    YouTube is the second most visited website in the world, after Google.

362.    YouTube users can stream (*i.e.*, view) audiovisual content (the "videos"), but are

*not* permitted to make permanent, unrestricted copies of the videos (or any songs contained in

those videos) through YouTube.

363.    Plaintiffs own or control songs that they made available on digital streaming

platforms including YouTube and Spotify, among others (the "Protected Platforms").

364.    These services employ technological protection measures ("TPMs"), including

encryption, authentication protocols, and digital rights management systems, to control access to

the underlying songs.

365.    Suno circumvented these TPMs to unlawfully access, copy, and ingest Plaintiffs'

songs into its AI training dataset.

366.    Plaintiffs, Class Members, and Subclass Members upload and/or distribute their

songs to their YouTube channels and other Protected Platforms.

367.    When uploading to YouTube and other Protected Platforms, Plaintiffs, Class

Members, and Subclass Members include information in the description for their videos containing their songs identifying copyright status, copyright management information, the name of the applicable music distributor, the name of the record label, if applicable, and other relevant information to the song(s).

368.    The Terms of Service for YouTube and other Protected Platforms prohibit the unauthorized use of the songs and videos available on its platform[75].

369.    While YouTube and other Protected Platforms may provide for a limited download feature for paying subscribers, they do *not* permit downloading and making permanent, unrestricted copies of the videos or songs.

370.    In order to enforce this restriction, YouTube in particular deploys an anti-circumvention procedure called "rolling cipher," which provides technical protection for YouTube's videos.

371.    Rolling cipher encryption controls access to YouTube videos by preventing external sites or services from directly downloading protected YouTube videos.

372.    YouTube maintains two (2) different URLs for any given video: 1) the "page URL", visible to YouTube users (which can be copied and pasted from a browser like Chrome), and 2) the "file URL", which is not visible to YouTube users, and is for the video file itself that is played within the page.

373.    The file URL is encrypted using a rolling cipher algorithm that is regularly changing and is specifically designed to stop external access of YouTube videos (e.g., downloading, copyright, distributing videos).

374.    The very purpose of the rolling cipher is to stop a YouTube user from gaining

---

[75] *See* YouTube, "Terms of Service," https://www.youtube.com/static?template=terms, last accessed September 21, 2025. 1. *See Green v. United States Dep't of Just.*, 111 F.4th 81, 89 (D.C. Cir. 2024) ("[M]any subscription-based video or music streaming services protect their copyrighted . . . music from unauthorized access by . . . encrypting the accessed media to prevent unauthorized copying.").

access to copies of videos and songs as permanent, unrestricted downloads.

375.     Despite the rolling cipher safeguard and restrictions set forth in the YouTube Terms of Service, there are numerous "stream-ripping" tools available on the Internet that enable the unauthorized downloading of videos and songs from YouTube with just a click of a button.[76]

376.     Use of these stream-ripping tools to circumvent YouTube's rolling-cipher measure is the circumvention of a copyright protection system.[77]

377.     Use of these stream-ripping tools to circumvent other Protected Platforms' TPMs is the circumvention of copyright protection systems.

378.     Just weeks ago, *Billboard* exposed Suno's illegal scraping of songs on YouTube, after the international music publishing trade association (ICMP) shared exclusive evidence with Billboard regarding the unlawful conduct by Suno.[78]

379.     Suno's unauthorized extraction, copying, and storage of Plaintiffs', Class Members', and Subclass Members' songs from YouTube for use in its training data was accomplished by Suno's unlawful circumvention of YouTube's rolling cipher and any other technological measures YouTube may have implemented to prevent the downloading and copying of YouTube's videos and songs.

380.     Suno's actions constitute a breach of the Digital Millennium Copyright Act's (DMCA) anti-circumvention provisions, which state, among other things, that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this

---

[76] *Stream-Ripping Is Next Frontier for Piracy Wars*, The Hollywood Reporter, December 4, 2020, accessible at https://www.hollywoodreporter.com/business/business-news/stream-ripping-is-next-frontier-for-piracy-wars-4099909/, last accessed September 21, 2025.
[77] *See UMG Recordings, Inc. v. Kurbanov*, 2021 WL 6492907, at *9 (E.D. Va. Dec. 16, 2021), report and recommendation adopted, 2022 WL 20417526 (E.D. Va. Feb. 10, 2022) (noting that "[m]ultiple courts have found that [a] Defendant's Websites are illegal for their stream-ripping functionality.").
[78] R. Smirke, *'The Largest IP Theft in Human History': Breaking Down the Years-Long Investigation Into How AI Firms are Stealing Music*, Billboard, Sept. 9, 2025, available at https://www.billboard.com/pro/ai-firms-steal-music-scrape-copyright-icmp-investigation/, last accessed September 21, 2025.

title."[79]

381.    These facts evidence that Suno did not lawfully license or otherwise obtain access to the songs of Plaintiffs, Class Members, and Subclass Members, but instead accessed their songs on a piracy basis by circumventing YouTube's technological protection measures through stream ripping.

382.    By unlawfully extracting and copying copyrighted sound recordings directly from YouTube in violation of both its Terms of Service and the DMCA's anti-circumvention provisions, Suno knowingly ingested Plaintiffs', Class Members', and Subclass Members' songs into its training data without authorization, compensation, or consent.

383.    This conduct confirms that Suno's dataset is soiled with piracy and misappropriation, and that Suno's commercial exploitation of its AI-generated outputs rests on systematic theft of the music of Plaintiffs, Class Members, and Subclass Members.

## Suno Does Not Qualify for Fair Use

384.    As it relates to Protected Platforms and Suno's intentional circumvention of TPMs in order to gain unauthorized access to the songs of Plaintiffs', Class Members', and Subclass Members' songs, the fair use doctrine is not a defense to such a violation, as 17 U.S.C. § 1201(a) creates a new access control right independent from copyright infringement[80]

385.    As it relates to fair use as a defense to Plaintiff and Class Members' copyright infringement counts, Suno additionally cannot claim fair use.

386.    Fair use is about determining whether the unauthorized use of another's

---

[79] 17 U.S.C. § 1201(a)(1)(A).

[80] *See* MDY Industries, LLC v. Blizzard Entertainment, Inc., 629 F.3d 928, 950–52 (9th Cir. 2010) (§1201 creates rights distinct from copyright infringement and does not require a copyright registration); *Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178, 1193–94 (Fed. Cir. 2004) (§1201 establishes a cause of action independent from copyright infringement); *See also Ticketmaster L.L.C. v. Prestige Entm't W., Inc.*, 315 F. Supp. 3d 1147, 1170 (C.D. Cal. 2018) (a plaintiff need not allege infringement to state a claim under DMCA's anti-circumvention provision).

copyrighted work is "fair," and therefore permissible.[81]

387.    The intentional theft of millions of songs created by independent artists is appalling, wrong, unjustified, and certainly not fair. Suno's conduct violates the very purposes of the copyright law and runs contrary to the purpose of the fair use doctrine.

388.    Pursuant to the Copyright Act, 17 U.S.C. § 107, fair use may exist related to "criticism, comment, news reporting, teaching . . . scholarship, or research."

389.    These allowances under fair uses reflect the policy of ensuring the purpose of the Copyright Act, which is to promote the progress of art and science by real human authors.

390.    Suno's wholesale copying of countless songs owned by independent artists, Plaintiffs, and Class members serves none of these purposes, and was simply done for commercial gain by Suno.

391.    In furtherance of this commercial gain objectives, Suno copied Plaintiffs', Class Members', and Subclass Members' expressive music catalogs, specifically designed to evoke emotion and passion, in order to create AI music, an exact competing product.

392.    Suno is unable to argue any functional purpose for its AI model to ingest the songs of Plaintiffs, Class Members, and Subclass Members, other than to create new, competing AI Music.

393.    Pursuant to 17 U.S.C. § 107, the four factors of the fair use doctrine are: (1) The purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) The nature of the copyrighted work; (3) The amount and substantiality of the portion used; and (4) The effect of the use upon the potential market for or value of the copyrighted work.

394.    Here, the use is far from transformative, as there is no functional purpose for Suno's

---

[81] *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 448 (1984).

AI model(s) to ingest Plaintiffs', Class Members', and Subclass Members' songs for a commercial purpose. Suno derives a financial benefit proportional to the number of music files it generates, further weighing the first fair use factor against it.[82]

395.    The second fair use factor also favors Plaintiffs. This factor recognizes that "certain 'works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied.'"[83]

396.    There is no doubt that the songs of Plaintiffs, Class Members, and Subclass Members are the type of "creative expression for public dissemination [that] falls within the core of the copyright's protective purposes."[84]

397.    So too does the third fair use factor weigh against fair use. "A finding of fair use is more likely when small amounts . . . are copied than when the copying is extensive or encompasses the most important parts of the original."[85]

398.    Suno admits it copied songs wholesale, which includes the most important parts of the protected songs, which is evident in AI Music's ability to recreate and mimic not only the most recognizable musical phrases, hooks, and choruses in popular music history (as also argued by major record labels in their Lawsuit against Suno), but also the songs created by independent artists, Plaintiffs, and the Class Members.

399.    Suno then uses these copies of key elements of protectable expression to generate AI Music that resemble the songs of Plaintiffs, Class Members, and Subclass Members it copied.

400.    As it relates to the fourth factor, Suno's use of songs of Plaintiffs, Class Members, and Subclass Members poses a significant threat to the market for and value of those copyrighted

---

[82] *Andy Warhold Found. For the Visual Arts., Inc.,* 598 U.S. at 532-3.
[83] *TCA TV Corp. v. McCollum,* 839 F.3d 168, 184 (2d Cir. 2016) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994)).
[84] *Hachette Book Grp., Inc. v. Internet Archive,* 664 F. Supp. 3d 370, 387 (S.D.N.Y. 2023) (quoting *Campbell*, 510 U.S. at 586).
[85] *Authors Guild v. Google, Inc.*, 804 F.3d 202, 221 (2d Cir. 2015).

songs. Even the U.S. Copyright Office affirmed that music licensing is a critical aspect of music ownership, and Plaintiffs and the Class Members certainly license their copyrighted recordings as part of their business models.

401. The U.S. Copyright Office Report is consistent with the above analysis, expressly acknowledging that the first and fourth factors are the most significant in evaluating fair use in the context of generative AI training.[86]

402. Suno's Website has the potential to generate directly competing AI Music at such speed that it risks overrunning the market for human-made sound recordings.

403. So much so that music streaming platform Deezer reports that nearly a third of all tracks uploaded to Deezer are now fully AI-generated (almost 33%).[87]

404. The first factor evaluates whether the use is transformative, meaning, it adds something new, not merely supersedes the original. Suno not only exploited independent music for a commercially competing product, but Courts have held, which the Copyright Office reiterates, that copying for a substantially similar expressive purpose, such as generating derivative content that competes in the exact same market, is not transformative and weighs against fair use.[88]

405. On the other hand, the fourth factor assesses whether the use causes harm to the actual or potential market for the original work. Meaning, if Suno's use causes harm to independent artists by negatively impacting the existing music market for artists' music, such a finding weighs against fair use.

406. Notably, the Copyright Office's report strongly cautions that: "Using copyrighted works to create outputs that serve as substitutes…" in fact would be directly harmful to the relevant

---

[86] Report at 74.

[87] Nearly A Third of All Tracks Uploaded To Deezer Are Now Fully AI-Generated, Says Platform, Music Business Worldwide, September 11, 2025, available at https://www.musicbusinessworldwide.com/nearly-a-third-of-all-tracks-uploaded-to-deezer-are-now-fully-ai-generated-says-platform/, last accessed September 22, 2025.

[88] *Id.* at 45–46 ("Training a model to generate outputs that are substantially similar to copyrighted works... is hard to see as transformative") (Citation removed).

marketplace and therefore weighs heavily against fair use.[89]

407.    Suno's unauthorized use of the songs of Plaintiffs, Class Members, and Subclass Members threatens to eliminate the existing market for licensing songs, as well as the future markets for licensing songs to generative AI companies.

408.    However, this decision to license one's songs to AI companies is a deeply personal one, and not one that should be forced upon a creator without their knowledge or consent.

409.    As noted, Suno's own CEO Mikey Shulman admitted that Suno's model already has the ability to produce outputs that replicate real songs and voices, and that Suno is only "holding back" because of the current legal landscape and uncertainty".[90]

410.    The many examples of Suno's outputs replicating "publicly available" songs and features, such as vocal performances and producer tags, refutes Defendants' claims that the AI "is not built that way."

411.    Moreover, these examples refute Suno's defense that these infringements are "transformative" works of fair use.

412.    A use is *not* transformative when it simply republishes or repackages the original work and brings no new expression.

413.    Here, Suno's AI model has time and again literally copied protected elements of pre-existing songs, doing the opposite of transforming them.

414.    For example, the CashMoneyAP tag within a Suno-generated track is indistinguishable from the original producer tag; no new expression of any kind has been brought.

---

[89] *Id*.

[90] Michael Mignano, Interview with Mikey Shulman (Suno CEO), at 43:55–44:53, posted on X (Twitter) (Mar. 8, 2024), available at https://x.com/mignano/status/1766151562299163030 (Shulman: Suno's model can already produce outputs that replicate real artists' vocals [in the CEO's example, Taylor Swift]  but the company is "holding back" offering exact voice cloning until the "licensing climate is a little less uncertain").; *See Also* Making Transformers Sing - with Mikey Shulman of Suno, Latent Space (Mar. 14, 2024), https://www.latent.space/p/suno (last visited Sept. 1, 2025).

415.    This is not a one-time anomaly, but rather part of a verified pattern. Industry commentators have identified examples of Suno churning out either the very producer drops or vocals sounding exactly like a specific artist, often with no such prompt.[91]

416.    Such outputs are "directly relate[s] to [the] training data" and are nothing more than the "regurgitation of memorized copyrighted data."[92]

417.    By definition, a work that simply regurgitates original, recognizable sound from a pre-existing work constitutes ordinary infringement rather than a transformative use.

418.    Courts and commentators have likewise cautioned that AI programs seeking to output something that substitutes the input are not making protected transformative use of it but rather are functioning as unlicensed engines of duplication.[93]

419.    Simply put, Suno's exact reproductive use of original sound points toward ordinary infringement and not toward new meaning or fair use.

420.    Plaintiffs, Class Members, and Subclass Members therefore reasonably, and with a good-faith basis, assert that Suno's AI model has generated outputs using their own songs, voices, signatures, samples, producer tags, and other underlying intellectual property rights.

421.    The repeated instances of near-verbatim reproductions of well-known songs and identifiers establish that Suno's AI model is capable of, and in fact does, regurgitate protected material from its training data.

422.    It is therefore reasonable to assert that the works of Plaintiffs, Class Members, and

---

[91] Ed Newton-Rex, Suno Is a Music AI Company Aiming to Generate $120 Billion Per Year. But Is It Trained on Copyrighted Recordings?, *Music Business Worldwide* (Apr. 2, 2024), https://www.musicbusinessworldwide.com/suno-is-a-music-ai-company-aiming-to-generate-120-billion-per-year-newton-rex/ (last visited Sept. 1, 2025
[92] Emmie Hine, Claudio Novelli, Mariarosaria Taddeo & Luciano Floridi, Supporting Trustworthy AI Through Machine Unlearning, *Sci. & Engineering Ethics* (Sept. 11, 2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11390766/ (last visited Sept. 1, 2025).
[93] Jason Koebler, AI Music Generator Suno Admits It Was Trained on 'Essentially All Music Files on the Internet', *404 Media* (Aug. 1, 2024), https://www.404media.co/ai-music-generator-suno-admits-it-was-trained-on-essentially-all-music-files-on-the-internet/ (last visited Sept. 1, 2025).

Subclass Members - each of whom has had music made publicly available online - have been subject to the same unlawful copying and misappropriation.

423.    Plaintiffs, Class Members, and Subclass Members will never be able to claw back their songs that Suno used to train its AI.

424.    Meaning, the training dataset is unable to be purged from Suno's AI model.

425.    Once AI ingests copyrighted music, those songs are stored in its neural network, and not capable of deletion or retraction.

426.    These acts by Suno were abuse and exploitation of another's intellectual property of the worst kind.

427.    Rather than license copyrighted songs like every other tech-based business is required to do, Suno elected to simply steal the songs of independent artists, Plaintiffs, and the Class Members to then generate AI-soundalike music at virtually no cost to Suno.

428.    There are existing licensing avenues available to Suno, a business valued at $500 Million, paying for the songs that make the Suno Website possible, and obtaining consent from independent artists and other rightsholders.

## CLASS ACTION ALLEGATIONS

429.    Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated.

430.    Plaintiffs propose the following Class definitions, including subclasses (collectively, the "Class"), subject to amendment as appropriate:

A. **Registered Works Class — All persons and entities in the United States who own or control U.S.-registered copyrights in sound recordings and/or musical compositions that were made available on internet-based streaming services since January 1, 2021, and whose works were copied, ingested, or used by Suno, Inc. to train, validate, fine-tune, or operate its AI music-generation systems without authorization**

B. **Registered Works (Injunctive) Class — All members of the Registered Works Class seeking injunctive and declaratory relief prohibiting Suno from copying, retaining,**

or using their registered works (including intermediate caches/weights/checkpoints) and requiring reasonable remedial measures to prevent future use.

C. **DMCA Class — All persons and entities in the United States who own or control sound recordings or musical compositions that were made available on digital streaming platforms employing technological protection measures (including, without limitation, YouTube and Spotify), and whose works were accessed, copied, or ingested by Suno through circumvention of such technological protection measures, without authorization since January 1, 2021.**

D. **DMCA (Injunctive) Class — All members of the DMCA Class seeking injunctive and declaratory relief under 17 U.S.C. § 1203 to bar future circumvention and require deletion/cessation of use of materials obtained by circumvention.**

E. **Tennessee Resident Artist Subclass — All natural persons who were Tennessee residents at the time of filing and who created, performed, or produced original musical works made publicly available online, and whose names, voices, likenesses, producer tags, or other identifying elements of artistic persona were misappropriated, used, or exploited by Suno, Inc. in connection with the development, training, marketing, or operation of its AI music-generation platform, without authorization or compensation since January 1, 2021.**

431.    Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff. Also excluded from the Class are individuals or entities whose claims accrued outside of the applicable limitations period for causes of action alleged herein.

432.    Plaintiffs reserve the right to amend or modify the class definitions with greater specificity or division after having an opportunity to conduct discovery. The proposed Class meets the criteria for certification under Rule 23 of the Federal Rules of Civil Procedure.

433.    <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number of Class Members is unknown to Plaintiffs now, but Plaintiffs estimate that there are thousands of Class Members.

434.    <u>Commonality</u>. There are questions of law and fact common to the Class, which

predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant copied, ingested, stored, or otherwise reproduced Plaintiffs' and Class Members' sound recordings and musical compositions without authorization;

b. Whether Defendant's conduct infringes Plaintiffs' and Class Members' exclusive rights under the Copyright Act, including the rights of reproduction, distribution, and preparation of derivative works;

c. Whether Defendant circumvented technological protection measures on streaming platforms such as YouTube and Spotify in violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1201;

d. Whether Defendant's ingestion and use of Plaintiffs' and Class Members' works, personas, voices, producer tags, and other identifiers constitutes unfair competition, unjust enrichment, or misappropriation under applicable state law;

e. Whether Defendant's conduct constitutes unfair or deceptive acts or practices affecting trade or commerce in violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 et seq.;

f. Whether Defendant acted willfully and knowingly in copying, ingesting, and exploiting Plaintiffs' and Class Members' works without authorization;

g. Whether Defendant's conduct deprived Plaintiffs and Class Members of licensing, monetization, and commercialization opportunities in the music marketplace;

h. Whether Defendant's outputs, including "sound-alike" works and reproductions of producer tags, voices, and other distinctive identifiers, are

substantially similar to or derived from Plaintiffs' and Class Members' works;

i.      Whether Defendant's representations and marketing of its AI-generated music as "new" or "original" were deceptive and likely to cause confusion regarding origin, sponsorship, or affiliation;

j.      Whether Defendant has been unjustly enriched by retaining revenues, subscriptions, and increased company valuation resulting from its unlawful conduct;

k.      Whether injunctive relief is necessary to prevent Defendant from continuing to copy, retain, or exploit Plaintiffs' and Class Members' works and identities;

l.      Whether Defendant should be required to delete and destroy all unauthorized copies of Plaintiffs' and Class Members' works from its training datasets, caches, checkpoints, weights, and AI models;

m.      The amount of statutory damages, actual damages, disgorgement, or restitution to which Plaintiffs and Class Members are entitled under the Copyright Act, the DMCA, the MMA (if applicable), and state law;

n.      Whether Plaintiffs and Class Members are entitled to treble damages, multiple damages, attorneys' fees, costs, and pre- and post-judgment interest under applicable federal and state statutes; and

o.      Such other questions of law or fact as may arise from Defendant's uniform course of conduct toward Plaintiffs and Class Members.

435.    These issues are common to the Class, and their resolution would advance matter and the parties' interests therein.

436.    <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Copyrighted material, like that of every other Class Member, was available on streaming

services and therefore improperly used by Defendant to train Defendant's generative AI model for commercial purposes. Plaintiffs' claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendant. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and no defenses are unique to Plaintiffs. Plaintiffs' claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

437. <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel is competent and experienced in litigating class actions.

438. <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all Plaintiffs' and Class Members' Copyrighted material was unlawfully used by Defendant in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

439. <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each

Class member.

440. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

441. Finally, all members of the proposed Class are readily ascertainable.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
### (Violation of Copyright Act, 17 U.S.C. § 106(1))

442. Plaintiffs and Class Members repeat, reallege, and incorporate the allegations contained in the previous paragraphs as if fully set forth herein.

443. Plaintiffs and the Class Members own or exercise exclusive control over rights in the federally copyrighted songs that Suno illegally copied, reproduced and used in training of its generative AI model and the development and production of the Suno Website to its customers. Plaintiffs and the Class Members have duly registered each of the Songs.

444. Suno has knowingly and willfully infringed Plaintiffs' and the Class Members' exclusive rights in copyrighted songs, including but not limited to those songs identified in Exhibit A, by reproducing them in violation of 17 U.S.C. § 106(1).

445. Suno does not have authorization, permission, license, or consent to reproduce or otherwise use the copyrighted songs of Plaintiffs and Class Members'.

446. Upon information and belief, Suno used the copyrighted songs of Plaintiffs and the Class Members, including those identified in Exhibit A, to train its generative AI model, and to produce the output Suno offers to its customers.

447. Each of Suno's acts of infringement of Plaintiffs' and Class Members' copyrighted songs is a willful violation of 17 U.S.C. § 106(1).

448. As a direct and proximate result of Suno's infringement of Plaintiffs' exclusive

rights, Suno has caused and will continue to cause irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law. Plaintiffs are therefore entitled to injunctive relief and to either actual damages and Suno's profits or statutory damages pursuant to 17 U.S.C. § 504(c), together with Plaintiffs' costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

### SECOND CAUSE OF ACTION
### (Violation of Copyright Act, 17 U.S.C. § 106(2))

449.    Plaintiffs and Class Members repeat, reallege, and incorporate the allegations in the previous paragraphs as if fully set forth herein.

450.    Plaintiffs and the Class Members own or exercise exclusive control over rights in the federally copyrighted songs (both the sound-recordings and compositions) that Suno has illegally copied, stored, reproduced and used in training of its generative AI model and the development and production of the service Suno offers to its customers.

451.    Plaintiffs and the Class Members have duly registered each of the songs.

452.    Upon information and belief, Suno violated Plaintiffs' and Class Members' distribution rights by transmitting and distributing infringing outputs of their songs to Suno's millions of users.

453.    Upon information and belief, Suno's generative AI model produces near exact replicas or adapt the original versions of the copyrighted songs of Plaintiffs and the Class Members, the Report states "[s]uch outputs likely infringe the reproduction right and, to the extent they adapt the originals, the right to prepare derivative works.

454.    Suno knowingly induced, encouraged, and profited from infringing outputs containing the songs of Plaintiffs and Class Members distributed to users of the Suno platform.

455.    Suno knowingly and willfully infringed Plaintiffs' and the Class Members' exclusive rights in copyrighted songs, including but not limited to those sound recordings identified in Exhibit A, by using them to prepare derivative works based upon the copyrighted

work in violation of 17 U.S.C. § 106(2).

456.    The derivative works prepared by Suno's generative AI system are central to the services Suno offers to its customers and constitute conduct by Suno itself.

457.    Suno does not have authorization, permission, license, or consent to use the copyrighted songs of Plaintiffs and Class Members to prepare derivative works.

458.    Upon information and belief, Suno used the reproductions of Plaintiffs and the Class Members, including those identified in Exhibit A, to train its generative AI model and to produce the output Suno offers to its customers.

459.    Each of Suno's acts of infringement of Plaintiffs' and Class Members' copyrighted songs is a willful violation of 17 U.S.C. § 106(2).

460.    As a direct and proximate result of Suno's infringement of Plaintiffs' exclusive rights, Suno has caused and will continue to cause irreparable injury to Plaintiffs for which Plaintiffs have no adequate remedy at law.  Plaintiffs are therefore entitled to injunctive relief and to either actual damages and Suno's profits or statutory damages pursuant to 17 U.S.C. § 504(c), together with Plaintiffs' costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

### THIRD CAUSE OF ACTION
**(Violation of the Digital Millennium Copyright Act,**
**17 U.S.C. § 1201 et seq.)**

461.    Plaintiffs, Class Members, and Subclass Members repeat, reallege, and incorporate the allegations in the previous paragraphs as if fully set forth herein.

462.    The Digital Millennium Copyright Act ("DMCA") prohibits the circumvention of technological measures that effectively control access to copyrighted works, 17 U.S.C. § 1201(a)(1), and prohibits trafficking in technology primarily designed for the purpose of circumventing such measures, 17 U.S.C. § 1201(a)(2).

463.    Plaintiffs, Class Members, and Subclass Members own or control sound recordings

and musical compositions that they made available on the Protected Platforms, including YouTube and Spotify.

464.    These services employ TPMs , including encryption, authentication protocols, and digital rights management systems, to control access to the underlying songs.

465.    Upon information and belief, Suno circumvented these TPMs to unlawfully access, copy, and ingest Plaintiffs', Class Members', and Subclass Members copyrighted songs into its AI training dataset.

466.    Suno engaged in "stream ripping," which strips away Protected Platforms' encryption access controls, thereby bypassing protections that restrict consumers to authorized playback and prohibit mass downloading.

467.    By circumventing the Protected Platforms' T'PMs, Suno unlawfully acquired complete copies of Plaintiffs', Class Members', and Subclass Members' songs without license, authorization, or payment.

468.    These copies were stored, reproduced, and used to train, validate, and operate Suno's generative AI music model(s).

469.    Suno's circumvention was willful and intentional. Suno has publicly admitted that its training data includes "essentially all music files of reasonable quality accessible on the open Internet," which necessarily includes songs protected by TPMs on the Protected Platforms.

470.    Suno further admitted that it avoided licensing constraints to build its model more quickly and cheaply. Investors candidly acknowledged that Suno's business model was premised on not obtaining licenses and on taking the "risk" of being sued.

471.    Plaintiffs, Class Members, and Subclass Members never authorized Suno to circumvent access controls on these platforms or to make reproductions of their works.

472.    The Terms of Service of the Protected Platforms prohibit such mass ingestion and

downloading, and Suno's circumvention of those restrictions violated 17 U.S.C. § 1201.

473.    As a direct and proximate result of Suno's violations of § 1201, Plaintiffs, Class Members, and Subclass Members have suffered injury, including loss of licensing revenue, diminished market value of their works, and deprivation of control over their protected content and identities.

474.    Suno's conduct in violation of 17 U.S.C. § 1201(a) as described herein was and is willful, intentional, and purposeful, in disregard of the rights of Plaintiffs, Class Members, and Subclass Members.

475.    As a direct and proximate result of Suno's violations of 17 U.S.C. § 1201(a), Plaintiffs, Class Members, and Subclass Members are entitled to either the maximum statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(A) or, in the alternative, their actual damages pursuant to 17 U.S.C. § 1203(c)(2), including Suno's profits from circumvention in amounts to be proven at trial, together with Plaintiffs', Class Members', and Subclass Members costs and reasonable attorneys' fees pursuant to 17 U.S.C. §§ 505 and 1203(b)(4)-(5).

## FOURTH CAUSE OF ACTION
### (Violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 et seq.)

476.    Plaintiffs, Class Members, Subclass Members repeat, reallege, and incorporate the allegations in the previous paragraphs as if fully set forth herein.

477.    The Tennessee Consumer Protection Act ("TCPA") declares unlawful any unfair or deceptive act or practice affecting trade or commerce within the State of Tennessee. Tenn. Code Ann. § 47-18-104(a).

478.    Plaintiffs, Class Members, and Subclass Members are Tennessee resident artists who have created, performed, and distributed songs on online platforms. These songs, along with their names, voices, producer tags, likenesses, and artistic personas, represent valuable commercial

goodwill.

479.   Suno engaged in unfair and deceptive acts and practices by misappropriating Plaintiffs', Class Members', and Subclass Members' songs, identities, and artistic signatures without consent, license, or compensation.

480.   Specifically, Suno ingested Plaintiffs', Class Members', and Subclass Members' songs into its AI model(s) and used their distinctive identifiers—including names, voices, and producer tags—to generate outputs that misappropriate their brands and identifies in order to directly compete with in the same marketplace.

481.   Suno deceptively marketed these outputs as "new" or "original," while concealing the fact that they were derived from misappropriated works and identities.

482.   Suno's unfair and deceptive conduct occurred, at least in part, in Tennessee, where Plaintiffs, Class Members, and Subclass Members reside, created their works, and experienced the injury. Suno's acts directly affected trade and commerce in Tennessee by diminishing the value of Plaintiffs', Class Members', and Subclass Members' works and depriving them of licensing and monetization opportunities.

483.   Suno's violations of the TCPA were willful and knowing. Suno intentionally avoided licensing obligations, misrepresented the nature of its AI training practices, and exploited the reputations and goodwill of Tennessee artists to build its business.

484.   As a direct and proximate result of Suno's violations of the TCPA, Plaintiffs, Class Members, and Subclass Members have suffered ascertainable losses, including lost licensing fees, diminished streaming and synchronization revenues, erosion of market share, and damage to their personal brands and reputations.

485.   Pursuant to Tenn. Code Ann. § 47-18-109, Plaintiffs, Class Members and the Tennessee Resident Artist Subclass seek actual damages, treble damages for willful and knowing

violations, attorneys' fees, costs, and appropriate injunctive relief to prevent further unfair or deceptive practices by Defendant.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request a judgment in their favor and against Suno as follows:

1. Certification of the Classes - Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

2. Declaratory Judgment - Declare that Defendant's acts and practices described herein violate the Copyright Act, the Digital Millennium Copyright Act, the Music Modernization Act (as applicable), the Tennessee Consumer Protection Act, and applicable common law doctrines including unfair competition, misappropriation, and unjust enrichment;

3. Injunctive Relief - Preliminarily and permanently enjoin Defendant, its officers, agents, employees, successors, assigns, and all persons acting in concert with it, from:

    a. Continuing to copy, ingest, reproduce, distribute, or otherwise exploit Plaintiffs', Class Members', and Subclass Members' songs without authorization;

    b. Circumventing technological protection measures on streaming platforms, including but not limited to YouTube and Spotify;

    c. Using, retaining, or distributing any songs, datasets, caches, checkpoints, weights, or other digital storage of Plaintiffs', Class Members', and Subclass Members' works within its AI models; and

    d. Marketing or commercializing AI-generated outputs derived from Plaintiffs',

Class Members', and Subclass Members' works without authorization or license;

4. Remedial Measures - Order Defendant to delete, purge, and destroy all unauthorized copies of Plaintiffs', Class Members', and Subclass Members' works from its systems, including training datasets, intermediate storage, caches, checkpoints, and model weights, and to submit to third-party verification of such deletion;

5. Damages Under the Copyright Act - Award Plaintiffs and the Registered Works Class all damages available under 17 U.S.C. ¬§ 504, including statutory damages for each infringed work, or, alternatively, actual damages and Defendant's profits attributable to the infringement;

6. Damages Under the DMCA - Award Plaintiffs and the DMCA Class statutory damages under 17 U.S.C. ¬§ 1203(c)(3), actual damages, and Defendant's profits attributable to circumvention, as well as attorneys' fees and costs under ¬§ 1203(b)(4)-(5);

7. Damages Under the MMA - Award Plaintiffs and the MMA Class (if applicable) statutory damages and other relief provided by 17 U.S.C. ¬§ 1401;

8. Damages Under State Law - Award Plaintiffs and the Tennessee Resident Artist Subclass actual damages, treble damages for willful and knowing violations under Tenn. Code Ann. ¬§ 47-18-109, attorneys' fees and costs, and such other relief as provided under the TCPA;

9. Equitable Restitution and Disgorgement - Require Defendant to disgorge and make restitution of all ill-gotten gains, revenues, and profits derived from its unlawful conduct;

10. Attorneys' Fees and Costs - Award Plaintiffs reasonable attorneys' fees, costs, and expenses as authorized by federal and state law, including but not limited to 17 U.S.C.

¬§§ 505, 1203(b)(4)-(5), and Tenn. Code Ann. ¬§ 47-18-109;

11. Pre- and Post-Judgment Interest - Award pre- and post-judgment interest as permitted by law; and

12. Further Relief - Grant such other and further relief as the Court may deem just and proper.

## **<u>JURY DEMAND</u>**

Plaintiffs demand a trial by jury on all claims for which trial by jury is proper.

///

///

///

///

Dated: September 22, 2025

/s/ Jarrett L. Ellzey
Jarrett L. Ellzey, Texas Bar No. 24040864
*Pro Hac Vice Admission*
Leigh S. Montgomery, Texas Bar No. 24052214
*Pro Hac Vice Admission*
**EKSM, LLP**
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Telephone: (888) 350-3931
Facsimile: (888) 276-3455
jellzey@eksm.com
lmontgomery@eksm.com

/s/ Krystle Delgado
Krystle Delgado, AZ Bar No. 031219
*Pro Hac Vice Admission*
**Delgado Entertainment Law, PLLC**
6803 E Main St # 1116
Scottsdale, AZ 85251
Telephone: 480-248-0657
krystle@delgadoentertainmentlaw.com

Michael V. Glennon, BBO# 678977
Brody, Hardoon, Perkins & Kesten, LLP
265 Franklin Street, 12th Floor
Boston, MA 02110
Telephone: (617) 880-7100
mglennon@bhpklaw.com

***Attorneys for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that this document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent September 22, 2025 to those identified as nonregistered participants.

          */s/Jarrett L. Ellzey*
          Jarrett L. Ellzey